UNITED STATES of America,
Plaintiff-Appellee,

v.

Shannon N. MAHAR (85–1411), Inner-City Medical Services, Inc. (85–1413), Riley Mahar (85–1466), Defendants-Appellants.

Nos. 85–1411, 85–1413 and 85–1466.

United States Court of Appeals,
Sixth Circuit.

Argued April 22, 1986.

Decided Sept. 24, 1986.

Stephen T. Robinson, Asst. U.S. Atty., Detroit, Mich., for U.S.

John Christensen, Detroit, Mich., for Riley Mahar.

Richard P. Yanko, Birmingham, Mich., for Shannon N. Mahar.

Robert S. Harrison, Birmingham, Mich., for Shannon N. Mahar and Inner-City Medical Services, Inc.

Before MERRITT and JONES, Circuit Judges, and THOMAS, Senior District Judge.*

WILLIAM K. THOMAS, Senior District Judge.

This criminal appeal involves the operation of Inner-City Medical Services, Inc.

(dba Inner-City Medical Clinic), a Michigan corporation, during the period of a charged criminal conspiracy. The relevant years are 1981, 1982 and the first half of 1983.

Shannon Mahar owned the majority of the stock of Inner-City Medical Services, Inc.[1] and was its president. Walter V. Mahar, father of Shannon, was secretary-treasurer of the corporation. Riley Mahar, a registered pharmacist, was manager of the Clinic's pharmacy, licensed in the name of Inner-City Medical Services, Inc. Terrance[2] Mahar, whose registration as a pharmacist had been suspended, continued to work in the pharmacy during the period covered by the indictment. Kent Oliver supervised the X-rays of patients. Dr. Stephen B. Kay was the examining doctor on Monday, Tuesday, Thursday, Friday and Saturday. Maurice Norris, a supervisor, usually in charge of the "pink chair," also operated the nearby computer terminal. There, drug medications to be sold to each patient were selected and programmed into the Clinic computer, which printed out the prescriptions in the pharmacy.

Under 21 U.S.C. § 846,[3] the foregoing persons and Inner-City Medical Clinic were charged in count 1 of a 32 count indictment with conspiracy to distribute schedule II, III, IV & V controlled substances. Among its allegations, count 1 charged that as part of the conspiracy:

SHANNON N. MAHAR and his father, WALTER V. MAHAR, also an officer of INNER–CITY MEDICAL SERVICES, INC., operated INNER–CITY MEDICAL CLINIC for the purpose, among others, of unlawfully selling controlled sub-

---

* The Honorable William K. Thomas, Senior District Judge of the United States District Court for the Northern District of Ohio, sitting by designation.

1. Government Exhibit 37A, a filing of Riley Mahar with the Michigan State Board of Pharmacy, shows that Riley Mahar asserted a 25% ownership interest in Inner-City Medical Services, Inc. On March 9, 1975 Shannon Mahar, as president of Inner-City Medical Services, Inc., filed with the Michigan Department of Commerce a "Certificate of Change of Registered Office" to 15101

Livernois, Detroit, Michigan. He continued as the corporation's resident agent.

2. The spelling "Terrance" is used in the trial transcript. The name is spelled "Terrence" in the indictment.

3. This section provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter is punishable [under the statute] ... for the offense, the commission of which was the object of the attempt or conspiracy."

stances and unlawfully issuing and selling prescriptions for controlled substances, all outside the usual course of medical practice and for no legitimate medical purpose....

SHANNON N. MAHAR's brothers, RILEY MAHAR, a pharmacist, and TERRENCE R. MAHAR, a pharmacist, operated a pharmacy inside INNER–CITY MEDICAL CLINIC, for the purpose, among others, of filling prescriptions for controlled substances, which, as they knew, had been issued outside the usual course of medical practice and for no legitimate medical purpose.

In counts 2 through 16 each of the defendants, except Maurice Norris, was individually charged with the unlawful distribution of a named controlled substance to an identified person, in violation of 21 U.S.C. § 841(a)(1),[4] and 18 U.S.C. § 2 (Aiding and Abetting).

Counts 18 through 32 charged each of the defendants, except Maurice Norris, with a violation of mail fraud under 18 U.S.C. § 1341,[5] and 18 U.S.C. § 2 (Aiding and Abetting). Each of these counts identified a particular State of Michigan Treasurer's warrant or Blue Cross/Blue Shield Michigan check sent and delivered by the postal service in an envelope addressed to Inner-City Medical Services, Inc., 15101 Livernois, Detroit, Michigan 48238. Paragraph 1 of count 18, incorporated by reference in counts 19 through 32, alleged in part that the defendants

devised and intended to devise a scheme and artifice to defraud and to obtain money by means of false and fraudulent pretenses and representations from Medicaid, a state and federally funded assistance program, and Blue Cross/Blue

Shield of Michigan and other insurance companies....

It was part of the scheme and artifice that the defendants knowingly, intentionally and unlawfully distributed and aided and abetted the distribution of controlled substances to INNER–CITY MEDICAL CLINIC "patients" by knowingly and willfully dispensing drugs and issuing prescriptions for drugs outside the usual course of medical practice and for no legitimate medical purpose.

Paragraph 1 of count 18 further alleged:

It was a further part of the scheme and artifice that defendants required that patients at INNER–CITY MEDICAL CLINIC provide proof of medical insurance and/or Medicaid coverage and submit to medically unnecessary and unwarranted testing procedures in order to obtain controlled substances....

It was further a part of the scheme and artifice that in addition to blood tests, INNER–CITY MEDICAL CLINIC patients were required to submit to the following tests and procedures, among others, for which defendants knew there was no legitimate medical need or purpose:

pulmonary function studies;
electrocardiograms;
urinalysis;
X-rays;
tuberculosis tests;
and cultures.

It was a further part of the scheme and artifice that Medicaid and Blue-Cross/Blue Shield of Michigan and other insurance companies were billed for the tests and procedures administered to INNER–CITY MEDICAL CLINIC patients and, in some instances, for the drugs distributed to the patients, and

---

**4.** This section provides, in pertinent part:

 (a) Except as otherwise authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

 (1) to ... distribute, or dispense, a controlled substance.

As the trial court correctly instructed the jury, it is not a violation of this section for "a physician to prescribe and a pharmacist to fill prescriptions for controlled substances in the usual course of medical practice for legitimate medical purposes." The basis of the court's instruction is 21 C.F.R. § 1306.04.

**5.** This section provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud," uses the mails for such fraudulent purposes, is punishable under the statute.

that in the billings, and elsewhere, it was expressly and/or impliedly represented that the drugs, tests and procedures were medically necessary and warranted, when in fact and as defendants well knew they were not.

Finally, in count 17 Shannon N. Mahar and Walter V. Mahar were charged with engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848.[6]

The defendants' seven week trial in the district court ended on February 26, 1985. The jury convicted defendants Shannon Mahar, Riley Mahar and Inner-City Medical Clinic on the count 1 conspiracy charge under 21 U.S.C. § 846. As to counts 2–11, and 13–16[7] (violations of 21 U.S.C. § 841(a)(1)), defendant Shannon Mahar was found guilty of counts 2, 3, 6–9, 11, 13, 15, 16. Defendant Riley Mahar was found guilty of counts 2–8, 10, 11, 13–16, and defendant Inner-City Medical Clinic was found guilty of counts 2–11 and 13–16. Inner-City Medical Clinic was convicted of mail fraud under counts 18 through 32 and defendant Shannon Mahar was convicted of all these counts except count 19. On counts 18–32 the jury found Riley Mahar not guilty. The jury further convicted Shannon Mahar of engaging in a continuing criminal enterprise under count 17 (21 U.S.C. § 848).[8]

The disposition of the charges against the remaining defendants was as follows: Before trial Maurice Norris plead guilty to count 1. During trial defendant Walter V.

Mahar suffered a heart condition that required hospitalization. The charges against him were severed and the trial proceeded as to the other defendants. Subsequent to the trial he plead guilty to the count 1 conspiracy charge and to mail fraud. Dr. Stephen B. Kay was acquitted by the trial judge at the conclusion of the government's case. The judge made a finding of "no specific intent." Kent L. Oliver and Terrance R. Mahar were both acquitted by the jury on all counts on which each was charged.

## I.

Each of the three appellants asserts separate grounds of error, and each adopts and incorporates the arguments of the other appellants. Before considering the principal claims of error, the court will first review the evidence and will also consider whether it is sufficient to support the convictions.

## A.

Among the thirty-five witnesses who testified in the government's case were four undercover law enforcement officers (three FBI special agents and a Detroit police officer).[9] With reference to substantive counts 2–16 of the indictment, these witnesses testified as to their visits as "patients" at the Clinic. A total of six long-time Clinic patients also testified about their visits to the Clinic. Patient records

---

**6.** This section provides, in pertinent part, that a person is engaged in a continuing criminal enterprise if

(1) he violates any provision of this subchapter or subchapter II of this chapter … and

(2) such violation is a part of a continuing series of violations …

(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, … or any other position of management, and

(B) from which such person obtains substantial income or resources.

**7.** The trial court dismissed count 12 before submitting the case to the jury.

**8.** Shannon Mahar received a total sentence of 25 years, a 2 year special parole term and a

$130,000 committed fine. Riley Mahar received a total sentence of 10 years, a 2 year special parole term, and a $72,000 committed fine. The Clinic was fined a total of $185,000.

**9.** Each undercover officer used an assumed name and false ID and insurance cards. Counsel for the defendants dwelt on the law officers' false documents and their purported physical complaints in attacking the credibility of these witnesses and in charging unfairness on the part of the government. It is evident the jury resolved these credibility issues against the defendants. The three FBI special agents were William Don Tisaby, Henry W. Glaspie III and Robert Lett. Donald Sims was the Detroit police officer.

covering Clinic visits were received in evidence.

Other witnesses included various employees of the Clinic, who described its operation. The Clinic's computer software programmer explained the computer system, the programs he had installed, and the Clinic's use of the computer system. An internist and a pharmacist, called as expert witnesses by the government, gave their opinions regarding medical and pharmaceutical practices and standards. Representatives of Michigan's Medicaid program and of the state's Blue Cross/Blue Shield system also testified.

Inner-City Medical Clinic was located in a building at 15101 Livernois, Detroit, Michigan. A sign on the building stated "Medical Clinic and Weight Control—Medicare, Medicaid, Blue Cross." Another sign stated "Doctor is Here Now." A nearby sign announced "Open 7 days 9:00 AM–6:00 PM."

The front door of the Clinic opened into a waiting room. Along the inner wall was the glassed-in desk of the receptionist. One door of the waiting room led to the Clinic pharmacy and another door of the waiting room led to examination and testing rooms behind the waiting room. One of several signs read "PLEASE DIRECT *ALL QUESTIONS* TO THE RECEPTION PERSON AT THE FRONT WINDOW *NOT* TO THOSE PERSONS CALLING PATIENTS INTO EXAMINATION ROOMS." Another sign stated, in part, *"NO CHANGES* OR ADDITIONS AFTER YOU LEAVE THE PINK CHAIR. NEXT VISIT—*14* DAYS." Patients were required to present to the receptionist a medical card (Blue Cross or Medicaid) and an ID card.

On a typical day at least 100 patients visited the Clinic. Twenty to twenty-five persons were lined up in the waiting room, and other persons were standing outside the Clinic. When a person's name was called by the receptionist the patient was taken into an inner area and asked by a medical assistant why he or she was seeing the doctor. Typical answers were "pain

and nerves," "diet," "weight loss and pain," "a back problem," "cold problem" and "pain." However, when one undercover officer said "back problem," he was told "the doctor would not buy a back problem." He then indicated that he was having a pain in the heel of his foot and that his neck hurt. This changed complaint was accepted.

Most of the long-time patient-witnesses testified that complaints of pain, cold, and overweight were often not true, and that their purposes in going to the Clinic were to obtain drugs. They told of selling the drugs on the street outside the Clinic, or elsewhere away from the Clinic. On some occasions drugs and money were seen to change hands in the waiting room.

Several witnesses worked as medical assistants during part of the time they were employed at the Clinic. Each stated that she took information from each patient, including physical complaints that brought the patient to the Clinic. Each medical assistant also explained that height, weight, blood pressure and pulse of patients were obtained and recorded. Patients similarly testified that such information was taken by Clinic employees. This information became part of the patients' medical records.

In the Clinic's back rooms, urine samples were taken and blood was taken from patients once a month. Several patients reported that they were told by employees that, in exchange for a payment to the employee ($5.00 for one, $10.00 for another), no blood would be taken. One patient testified that when blood was taken, six six-inch tubes were filled.

Medical assistant Karen Lasenby testified that patients would pay not to have blood drawn, that she had seen payments made and that defendant Walter Mahar "started receiving phone calls from patients about this." He called a meeting of employees and said he "didn't want it done anymore ... he was getting too many complaints." Ms. Lasenby named five employees whom she had observed accepting money for not drawing blood. She admitted

that Shannon Mahar had told the employees that if they did that type of thing it would be improper and they would be fired. However, no employee was ever fired for taking payments not to draw blood.

Carrying the patient's chart (a computer printout), the medical assistant escorted each patient into room 6 to see Dr. Kay. Medical assistant Vanessa Goodrum said that Dr. Kay "would sometimes take the stethoscope up to the patient's heart." The patients repeatedly testified that Dr. Kay's stethoscope examinations lasted just a few seconds. While some patients said that Dr. Kay would state what tests were needed, he rarely asked questions or said anything at all to the patients. Ms. Goodrum said further that she "would tell Dr. Kay what the patient's in for, give him the vital signs and everything on the chart that he would need, and then he would circle whatever the patient was in for and then we would leave." In red, Dr. Kay would usually circle "P" for pain, "C" for cold, "D" for diet, or "N" for nerves. Patients indicated that Dr. Kay's entire examination lasted 1 to 3 or 4 to 5 minutes.[10]

After Dr. Kay circled the pre-printed letter on the patient's chart, the patient was taken to the "pink chair." There, the person in charge of the chair and the computer terminal, usually Maurice Norris, determined the drug medications to be sold to the patient. Medical assistants at times relieved Maurice at the pink chair. The person in charge would go through the patient's chart, see what the patient had regularly received, and prescribe the same medications. Sometimes a patient would ask what he or she could get. Walter V. Mahar instructed employees to give the patient what the patient had received before. The person in charge of the pink chair keyed in a code for a particular drug on the computer terminal and the prescription was printed out as a bottle label in the pharmacy. If Terrance Mahar told the pink chair employee that the pharmacy

didn't have a particular drug, the patient "had to take something else."

The principal tests given the patients were blood tests, urinalysis, X-rays, electrocardiograms (EKGs), and pulmonary function studies (PFS). The person in charge of the pink chair would look over the patients' histories and decide which of these tests the patient should receive. Medical assistant Lasenby testified that Dr. Kay didn't know what tests were taken, and that "We would do all the testing." Shannon Mahar had given the instruction that every patient with a cold should get a sinus X-ray. Maurice told "patient" Glaspie, "If you want Talwins you better be X-rayed." Either Walter Mahar or Shannon Mahar had given the instruction that in ordering the EKG or the PFS, the person in charge of the pink chair "had a time limit" on these tests. The trial judge asked, "Who got them, people there for pain, for cold, for nerves, for what?" Ms. Goodrum answered, "Everybody." The trial judge then asked, "Every patient?" and the witness answered "Yes."

After completion of tests the patient was directed to return to the waiting room. When the patient's prescription number was called by the receptionist the patient paid the specified cost and received the drugs. In all described instances each patient received two bottles of drugs, each containing a prescription label on which was typed the name of Stephen B. Kay, M.D. and Inner-City Medical Clinic Pharmacy. According to medical assistant Lasenby, the most frequently prescribed drugs were Desoxyn (an amphetamine for weight loss), Tylenol 4 and Talwin (for pain), and Ambenyl (a codeine cough medicine). The prices paid to the Clinic varied from a few dollars to $55.00, depending on the drugs purchased. A written notice in the medication sack from Dr. Kay stated: "Please

10. FBI special agent Glaspie was asked if he had seen "a physical examination performed by another physician which was like the one [he]

experienced at Inner-City from Dr. Kay?" He answered that he "didn't consider [himself] examined by him."

be advised that the doctor will be able to see you in 14 days but not before." [11]

Dr. Ira Freilich worked as the Clinic's examining doctor on Sundays from August 1981 through March 1983. Shannon Mahar hired him. In their initial face to face conversation at the Clinic, Shannon Mahar explained "what medicine at the Clinic would be like." He said, according to Dr. Freilich, that it "was a high-volume type of practice, and the patients were interested in receiving medication from the Clinic that I might not be used to prescribing, and that we would be ordering tests that I might not be used to ordering." Shannon Mahar identified the medications as "Ambenyl, a cough syrup" and the pain medications were "Tylenol with codeine, Empirin with codeine, and Talwin." He further told Dr. Freilich that "if [he] was to be employed by the Clinic that the patients would have to get what they wanted, or there would be no need for a physician."

In time the patient volume on Sunday between 10:00 A.M. and 7:00 P.M. grew to 65 to 80 patients. The patient examination took "[s]ix to eight minutes." Based on a patient's complaint and the history and examination that Dr. Freilich could "get in six to eight minutes," he would "usually prescribe the medications that the patient had requested." While he made the selection of tests on his own, Dr. Freilich stated that he knew that "if sufficient testing was not done the Clinic would not be profitable" and his "services would not be necessary." On the test "menu" Clinic employees circled in pencil "tests that hadn't been done

in awhile and could be done per Clinic schedule," but Dr. Freilich would "circle those that [he] thought could be justified medically." In addition, in light of the information he received Dr. Freilich would prescribe drugs for each patient. In contrast to Dr. Kay, Dr. Freilich would circle a particular prescribed drug. Also unlike Dr. Kay, he would sign prescriptions after they were printed out in the Clinic.

Dr. Freilich testified that he did not practice good medicine at the Clinic but "it created the appearance of good medicine." He stated that the prescriptions he issued and the tests that he ordered were "not medically necessary." [12] Asked if he recognized that it was his responsibility to determine whether or not prescriptions should be issued, he answered, "I was a rubber stamp for the prescriptions." Then asked if "somebody took advantage" of him, he answered, "I prostituted my medical license." For these medical services his compensation reached the figure of $1,000 a day for his last three months at the Clinic.[13]

Dr. Gregory Berger, an internist, was called by the government as a medical expert. Questions focused on five volumes of prescriptions seized from the pharmacy during the February 14, 1983 search of the Clinic. Dr. Berger was asked to assume that the prescriptions were "a compilation of prescriptions issued by the Clinic during six of the seven days that it's open and operating." He was asked to give his opin-

11. On one occasion "patient" Tisaby received a prescription of Talwin and Desoxyn from Maurice Norris but at no time that day did he see a doctor.

12. Asked if it was not true that he wrote Desoxyn (diet) prescriptions "responsibly and for medical necessity," he answered, " 'Yes' and 'No'. I did it according to the clinic guidelines. I did it according to medical necessity or practice."

13. On direct examination Dr. Freilich several times testified that he ordered tests that were "medically unnecessary." On cross-examination, he admitted that before the Grand Jury he had testified that many of "the tests that he administered at the time that the patients first

came to the clinic were justified." He admitted that neither the government attorney nor the FBI case agent had said anything to the Medical Licensing Board about him in the last two years. He was then asked if it was his understanding that "they're not going to if you today testify in the right way?" He answered, "That's what I hope." He further admitted on cross-examination that over the weekend (during his testimony) he was told by the government that he "would have to improve on his testimony with respect to prescribing medication and its harmful effect on patients." These admissions and his other admissions on cross-examination could have been used by the jury in assessing his credibility. Nonetheless the jury could also have believed other parts of his testimony that inculpated the defendants.

ion "simply based upon the prescriptions issued whether those prescriptions could have been issued in the usual course of a legitimate medical practice." He answered that the "majority of the drugs that are prescribed in these books that I reviewed are either amphetamines, or speeds, or opiate narcotic drugs." He said that he could not imagine "a medical practice that would have such a preponderance and a majority of the commonly abused drugs being prescribed in such a manner." He pointed out that there were two whole volumes of Tylenol 4, a whole volume of "Talwin, Preludin, Empirin, Desoxyn, which are amphetamines." Another volume was Ambenyl and the final volume was "predominantly Ambenyl." Asked what other drugs would commonly be prescribed in the usual course of medical practice, he answered, "Well, you'd see a lot of patients with colds; you'd need antibiotics." Continuing, he said, "you'd see patients with high blood pressure, patients with diabetes ... patients with heart trouble ... ulcer disease, diarrhea, vomiting.... [W]e don't see a general medical practice here." [14]

As for testing, Dr. Berger stated that an EKG is not appropriate for a cold or cough, and that a pulmonary function test is "definitely not a good test to order for cold or cough because if the person has a cold or is coughing they can't cooperate with a pulmonary function testing." On the question of blood tests, he answered that a "complete blood count to check for infectious cells in the blood might be appropriate if there were fever." He did not believe that a urinalysis was "an appropriate test for cold or cough." With respect to X-rays, a chest X-ray definitely would be ordered "if the patient had a fever or making sputum"

and "its acceptable either to [order] or not order the chest X-ray if the symptoms were lesser for cold or cough." But "X-rays won't help diagnose diet problems without specific complaints that you're trying to look for."

Dr. Berger was asked what determines, in the usual course of legitimate medical practice, which tests are done on blood samples drawn from a patient. He answered that the "physician orders the test in the usual medical practice based on his history and his physical exam and his attempts to make diagnosis." [15]

The government also called Gerald Bodendistal, a registered Michigan pharmacist, who is associated with a "prescription orientated pharmacy." He pointed out that Tylenol 4 and Empirin 4 each contains 1 grain of codeine and other components. Mr. Bodendistal stated that "the codeine in the strong dose could have a potential for drug dependence." Talwin is "used for moderate to severe pain" and "not for ordinary or minor pain." He said it had "a potential for abuse." Ambenyl, containing codeine, requires a prescription. He distinguished some cough syrups not requiring a prescription even though they contain codeine. Ambenyl is not one of those drugs. Desoxyn is a methamphetamine, a central nervous system stimulant, "that has been used in diet control, appetite suppression." He observed that it has "a high potential for abuse and is really prescribed not very often by most physicians because of that abusing." Preludin, containing Phenmetrazine, is a central nervous system stimulant used for appetite control. Because it tends to elevate blood pressure and increase heart rate it "must be used with caution

14. With reference to back complaints Dr. Berger noted the importance of taking a history of the back pain, and finding the factors that brought it on. He listed the tests used in a neurological exam that should be undertaken, and noted bed rest and other types of treatment. Though back pain was a common complaint for which drugs were prescribed, the record shows no back pain history was taken by Dr. Kay, nor by Dr. Freilich, and no neurological exam of patients was recorded in which muscle reflexes were tested.

15. On cross-examination Dr. Berger's testimony was qualified. Based on his review of the prescriptions and the information that was made available to him, he said he could not testify that "these prescriptions were not issued for a legitimate medical purpose." It was for the jury to resolve any possible contradictions in Dr. Berger's testimony.

with certain patients where this might be harmful."

Mr. Bodendistal stated that when there was a doubt about the legitimacy of a prescription the pharmacist "would refuse to dispense the prescription." Explaining this statement, he said that a pharmacist acting in the usual course of his legitimate practice would question whether the prescription was in fact issued for a legitimate medical purpose under these circumstances:

> When we see a large number of controlled substances come from one doctor or clinic and there are very few other medications prescribed for any other medical purpose, any pharmacist should be aware that there is something wrong that's not—other than legitimate medical practice may be going on, and based upon that data he should refuse to fill those orders.

### B.

We now consider the sufficiency of the evidence produced at trial to support the convictions on the various counts. The jury's verdict "must be sustained if there is substantial evidence, taking the view most favorable to the Government." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). We first consider the evidence as it relates to the count 1 charge of conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846.

As seen, the Clinic often received 100 or more patients per day. This means that in an 8 hour day—480 minutes—Dr. Kay spent no more than 4.8 minutes per examination (allowing no time between patients). These brief examinations, or even the 6 to 8 minute examinations conducted by Dr. Freilich, permitted the jury to find that it was impossible for the Clinic to conform to the usual course of medical practice. The

additional evidence, as reviewed above, showing that patients were regularly sold controlled substances (most "commonly abused drugs") selected by non-physician lay employees of the Clinic would further support a finding that controlled substances were issued outside the usual course of medical practice and for no legitimate medical purpose.

Shannon Mahar, the Clinic's president, administered the affairs of the Clinic. Thus he purchased and supervised the operation of the Clinic computer system installed in the fall of 1981. The main computer terminal was in his office.[16] He was present at the Clinic nearly every day, usually putting in long hours. Walter V. Mahar, along with Shannon, supervised and directed the activities of the Clinic's employees. Each day at the Clinic Walter spent time in the pharmacy "writing out checks, that sort of thing."

The evidence thus showed that Shannon and his father, Walter, shared the Clinic's management. Since Walter V. Mahar spent considerable time in the pharmacy and supervised the Clinic's employees, the evidence supports a finding that he knew about the Clinic's distribution of Schedules II, III and IV controlled substances to its patients and knew that this was not being done in the usual course of medical practice. Similarly, the evidence permitted a finding that Shannon was equally knowledgeable that drugs were distributed outside the usual course of medical practice.

Defendant Riley Mahar, manager of the Clinic's pharmacy and its licensed pharmacist, was responsible for the purchase and distribution of all the pharmacy's controlled substances. He knew of the nature and identity of the drugs that he was purchasing for use by the Clinic's patients. He knew that each patient was receiving drugs and knew of the types of drugs that

---

**16.** He worked with the computer programmer in devising the patient charts, billing forms, and other forms. The jury was entitled to find that he not only hired Dr. Kay but would have helped prepare the patient charts used by Dr.

Kay. Because he was in charge of the computer, he also would have known that at the pink chair Maurice Norris, or another employee, selected medications for each patient, often at the request of the patient.

the Clinic pharmacy was selling and distributing to the Clinic patients. His limited participation in managing the Clinic did not alter his non-delegable responsibility for the management of the Clinic's pharmacy. Moreover, the expert testimony of pharmacist Bodendistal provided the jury with a basis for finding that, as pharmacist, Riley was charged with responsibility for distribution of drugs to patients based on the prescriptions of Doctors Kay and Freilich. The jury could thus have determined that he knew large amounts of pain medications and weight loss medications were abnormally disproportionate to other drugs distributed and that such drugs were not ordinarily prescribed in such quantities by a doctor or medical clinic.

In toto, the evidence warranted the jury in finding that defendants Shannon Mahar, Riley Mahar and Walter V. Mahar [17] were responsible for the Clinic's illegal distribution of the Schedules II, III, and IV controlled substances. The evidence would further support a finding that these three individuals participated as coconspirators in the drug distribution conspiracy charged in count 1.[18]

 The evidence also supports the conspiracy conviction against the Clinic.[19] A

corporation acts through its officers, agents and servants when such acts are performed within the scope of and in the course of the duties or employment of such officer, agent and employee. The evidence indicated, and the jury was entitled to find, that Shannon Mahar, Walter V. Mahar and Riley Mahar each performed acts within the scope of and in the course of the corporate duties or employment of each individual defendant. Hence, the jury was entitled to impute to the Inner-City Medical Clinic any criminal act of each individual defendant.

The court correctly instructed the jury that count 1 of the indictment charged a conspiracy under 21 U.S.C. § 846, and quoted as follows from this section:

Any person who attempts or conspires to commit any offense defined in this subchapter is punishable ... [as for] the offense, the commission of which was the object of the attempt or conspiracy.

The court then stated that 21 U.S.C. § 841(a)(1) provides, in pertinent part, as follows:

It shall be unlawful for any person knowingly or intentionally to distribute or pos-

---

17. Although Walter V. Mahar reached a plea agreement with the government and is not a party to this appeal, his conduct must be considered in determining the sufficiency of the evidence on the conspiracy convictions of Shannon Mahar, Riley Mahar and the Clinic. As a coconspirator, his acts committed in the course of and in furtherance of the conspiracy may be charged to the other conspirators. As stated in *United States v. Christian*, 786 F.2d 203, 211 (6th Cir.1986) (quoting *United States v. Cuni*, 689 F.2d 1353, 1356 (11th Cir.1982)): "Proof of knowledge is satisfied by proof that the defendant knew the essential object of the conspiracy.... Every member of a conspiracy need not be an active participant in every phase of the conspiracy, so long as he is a party to the general conspiratorial agreement."

Moreover, the conduct of Walter V. Mahar is also pertinent in this case as it bears on all the remaining counts against the Clinic. As one of the Clinic's managers, Walter V. Mahar's actions could be imputed to the Clinic on the substantive distribution counts and the various mail fraud counts.

18. Each coconspirator need not participate in every overt act of the conspiracy in order for

the conspiracy convictions to be upheld. *See United States v. Christian*, 786 F.2d 203, 211 (6th Cir.1986). To obtain convictions under 21 U.S.C. § 846, "the government must prove that a conspiracy existed, that the accused knew of the conspiracy, and that he knowingly and voluntarily joined." *Id.* A defendant's "guilty knowledge and voluntary participation may be inferred from surrounding circumstances." *Id.*

In the instant case, each appellant played an important, although different, role in the conspiracy. Riley Mahar, for example, spent most of his time in the pharmacy, and had little to do with day-to-day management of the remainder of the Clinic. Nevertheless, his role as the pharmacist and manager of the pharmacy was an essential role in the overall drug distribution conspiracy.

19. It is noted that this circuit has held "that in the criminal context a corporation may be convicted of conspiring with its officers." *United States v. S & Vee Cartage Co.*, 704 F.2d 914, 920 (6th Cir.) *cert. denied*, 464 U.S. 935, 104 S.Ct. 343, 78 L.Ed.2d 310 (1983).

sess with intent to distribute a controlled substance.

The court went on to "caution" the jury that the law clearly permits a physician to prescribe and a pharmacist to fill prescriptions for controlled substances in the usual course of medical practice for legitimate medical purposes.

In other instructions the court correctly listed the elements essential to the offense of conspiracy charged in the indictment. In sum, we find that the conspiracy count instructions were adequate and sufficient. The evidence as previously highlighted and the findings set forth above support the conviction of each of the convicted defendants on count 1.

Similarly, except as hereafter indicated, the convictions of the defendants on particular substantive counts are supported by the evidence at trial, as highlighted above. Since substantive counts 2–11 and 13–16 charged each defendant both as a principal and as an aider and abetter, the part each convicted defendant played in the illegal sale and distribution of the identified controlled substances was sufficient to support conviction. Moreover, the convictions were warranted under the following instruction as to counts 2 through 16:

> If you find that a particular defendant is guilty of conspiracy as charged in count 1, you may also find that defendant guilty of a substantive offense as charged in any of counts 2 through 16 of the indictment, provided that you find that the essential elements of that count, as defined in these instructions have been established beyond reasonable doubt, and provided that you also find beyond reasonable doubt; first the offense defined in the substantive count was within the scope of the conspiracy and committed pursuant to the conspiracy; and, second, that the particular defendant was a member of the conspiracy

at the time the substantive offense was committed.[20]

However, there are two substantive counts, 13 and 14, for which the convictions are not sustained by the evidence.

■ Michael Smith said he had gone to the Clinic at least 18 times. The Clinic records show that he was there on March 8, 1982. This date, which sounded "about right" to him, is the date set forth in count 4 in which it is charged that the defendants illegally distributed Preludin to him. Count 13 cites illegal distribution of Talwin to Michael Smith on October 19, 1982. But no Clinic record of a visit to the Clinic on that date was called to his attention. Nor was it otherwise proved that controlled substances were illegally distributed to him on or about that date. Hence, the conviction on count 13 against the three defendants is set aside and vacated.

■ Count 14 of the indictment charged the defendants, on or about November 23, 1982, with unlawfully distributing and aiding and abetting the distribution of Phenmetrazine (Preludin) to Martin Hinton. Mr. Hinton stated that he went to the Clinic about six times, the first time in 1981, sometime in the summer. Pressed on examination for the period of time that he was there, Mr. Hinton said it was over a five or six month period; he'd be "pretty safe to say around '81." Whatever the reason may have been for Mr. Hinton's poor memory for dates, the five to six month period in 1981 in which he said he made visits to the Clinic does not embrace November 23, 1982, the date of the charged offense. Nor does other evidence support this count. It will be set aside and vacated.

■ Defendants Shannon Mahar and the Inner-City Medical Clinic were convicted of violating 18 U.S.C. § 1341 (mail fraud) in counts 18 through 32. As seen, the mail

---

**20.** The court then further charged the jury:

Under the conditions just defined, a defendant may be found guilty of a substantive count even though he did not participate in the acts constituting the offense as defined in the substantive count. The reason for this is that a

coconspirator committing a substantive offense pursuant to the conspiracy is held to be the agent of the other conspirators.

This language sufficiently conforms to *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

fraud counts, in part, charged "a scheme and artifice" in requiring that "patients at Inner-City Medical Clinic provide proof of medical insurance and/or Medicaid coverage and submit to medically unnecessary and unwarranted testing procedures in order to obtain controlled substances." Proof of the first requirement, that patients provide proof of medical insurance, is not disputed. Proof that patients were required to submit to medical tests was also established under the evidence, and the jury was entitled to make such a finding.[21] In addition, the testimony of Dr. Freilich, the Sunday Clinic doctor, and the testimony of Dr. Berger, together with reasonable inferences drawn from the evidence, permitted the jury to find that requiring medical tests (blood, X-rays, EKGs, PFS, etc.) for every patient was medically unnecessary and unwarranted and not related to legitimate medical practice. Other evidence, including the Clinic's billings to Michigan Medicaid and Blue Cross for such tests, and payments made to the Clinic through the U.S. mails by Medicaid state warrants and Blue Cross checks, satisfied the required element of the mail fraud counts that the use of the mails completed the execution of the scheme to defraud. *United States v. Castile*, 795 F.2d 1273, 1278 (6th Cir.1986).

The remaining count is count 17, on which Shannon Mahar was convicted of engaging in a continuing criminal conspiracy. All of the reviewed evidence, considered together with evidence of Shannon Mahar's receipt of Clinic profits, supported Shannon Mahar's conviction on this count.

Having reviewed the evidence in the record, and having concluded that such evidence supports the convictions of the defendants (with the exception of counts 13

and 14), we now separately consider each of the principal grounds of error which these defendants have raised on appeal.

## II.

Defendants contend that 12 pages of handwritten notes, marked collectively as Exhibit 22A, were improperly admitted into evidence. Defendants argue that the 12 pages of notes constitute inadmissible hearsay, and that no hearsay exception was established at trial.

## A.

The 12 pages of handwritten notes making up Exhibit 22A are undated and unsigned. FBI special agent James B. Walter testified that the notes were found along with "miscellaneous business records" in room 6. This room was occupied by Dr. Kay on his workdays and by Drs. Freilich and Yurina on their workdays. A handwriting expert called by the government testified that five of the 12 pages of Exhibit 22A were written by Dr. Wally Mahar and that three pages were written by Walter V. Mahar. The handwriting expert did not identify the author of the remaining four pages.

The notes making up Exhibit 22A appear to focus upon a Medicaid investigation into the Clinic's activities.[22] Thus, one of the twelve pages contains the heading: "What causes CAID to investigate." Below this heading is the following list:

1. Indication of fraud
2. Patient complaint
3. High vol. of claims
4. High vol. of dollars
5. High vol. of tests per pt. per visit
6. Double billing

---

**21.** One piece of evidence is illustrative. A sign in the waiting room read:

> ALL PRESCRIPTIONS MUST
> BE FILLED HERE, DUE TO
> RECENT PROBLEMS
> ALL TESTS MUST BE
> COMPLETED BEFORE ANY
> TREATMENT CAN BEGIN

Thus, in clear words the Clinic and Shannon Mahar, as its owner and president, boldly told

every Clinic patient that in order to get "treatment," i.e. drug prescriptions, the patients must submit to the completion of their tests.

**22.** Quotes from the notes are cited in the government's arguments, next discussed. For brevity's sake, the bulk of the notes that went to the jury as part of Exhibit 22A are not quoted.

### 7. Too frequent visits

During the first part of his closing jury argument, government counsel characterized the notes in Exhibit 22A as "a game plan for avoiding detection of fraud." Describing this exhibit as "evidence from the defendants' own mouths," the prosecutor displayed portions of the notes to the jury using transparencies on a video projector. He wove various quotes into his argument:

Ask yourself if this is not perhaps a precursor of this case.

Here we've got the question, "What causes CAID," Medicaid, "to investigate?"

And in a rather methodical process, we get to the conclusion, "High test volume per visit is reason for investigation."

Well, we know they had a very high test volume, didn't they, per patient at Inner City Medical Clinic.

He continued:

Then the notes go on (pause), "What do we do about it?" There's a high test volume per visit. Well, among the things we do is we get rid of the supplies in the lab that—"Get rid of supplies that should've been used." We get the lab in shape, organized, no paper forms, et cetera. We set up the lab to look like a lab. "Set up a procedure for blood sample flow. Riley and Terry can test and record results."

They have to put a lab coat on Riley, maybe even hire a lab technician. Maybe even Terry could serve as the lab technician.

But there are some other things you can do. You can, "Call attorney," and, "Panic."

. . . .

Above all, "Volunteer no information about anything."

The prosecutor also observed that the "problems, of course, are picked out quite well" in the notes, referring to these entries: "Multiple vague or non-specific complaints"; "So much time with each patient"; "Not very good history."

The prosecutor returned to Exhibit 22A in his rebuttal argument:

Government Exhibit 22A, the fraud outline in the handwriting of Wally Mahar and Walter Mahar, Mr. Yanko and Mr. Harrison explained one—tried to explain one particular statement on there, "Get rid of supplies in lab that should've been used," something like that. But did they explain the other statements?

For example, "Set up lab to look like a lab.

"Lab coat on Riley.

"Tell CAID," Medicaid, "lab results are out being converted to computer printout.

"Plan of action: Riley, cultures, smears, PFS.

Mom, Jan, test results, varied.

He then concluded as follows:

Those documents have not been explained, and they're powerful evidence because they're the defendants' own words.

### B.

The government argues that the notes in Exhibit 22A were not offered to prove the truth of the matters asserted and thus that the notes do not constitute hearsay. The principal case cited in support of this proposition is *United States v. Wilson*, 532 F.2d 641, 645 (8th Cir.), *cert. denied*, 429 U.S. 846, 97 S.Ct. 128, 50 L.Ed.2d 117 (1976), in which the court held that statements contained in notebooks found at the defendants' apartment were not hearsay "since they were not offered to prove the truth of the facts asserted therein." Rather, the notebooks "were admissible as circumstantial evidence (a) to show the character and use of the place where the notebooks were found and (b) to corroborate the informant's testimony." *Id.*

Although the government now advances the argument that the Exhibit 22A notes were not offered to prove the truth of the matters asserted, it is significant that at no time during the trial did government counsel offer to place such a limitation on the

use of the notes. When asked directly by the trial court for "the basis of the offer of these papers," the prosecutor responded that he was "offering it as coconspirator hearsay." In light of this statement at trial, government counsel's argument on appeal that the notes do not constitute "hearsay" because they were not offered to prove the truth of the matters asserted, appears to be an after-the-fact justification for the admission of the notes.[23]

Furthermore, it appears from the government's use of the notes at trial that the government did in fact intend to convince the jury of the truth of the matter of several statements in the notes. During his rebuttal argument, the prosecutor asked the jury to consider whether the defense had "explain[ed]" the statements in the notes, and then proceeded to recite several of these statements. By emphasizing, for example, the statement "High test volume per visit," the government apparently intended to convince the jury of the truth of the matter asserted: That there was in fact a "High test volume per visit" at the Clinic. The prosecutor's intent to prove the truth of the matters asserted is evidenced by his follow-up statement to the jury: "Well, we know they had a very high test volume, didn't they, per patient at Inner-City Medical Clinic."

Other examples of statements in the notes that the jury may have improperly considered for the truth of the matter asserted include, but are not limited to: "Get rid of supplies that should've been used"; "Double billing"; "High vol. of claims"; and "High vol. of dollars." Thus, the jury may have relied on these very statements "from the defendants' own mouths" as evidence that as part of the scheme charged in the mail fraud counts the Clinic did, for example, engage in double billing and did get rid of supplies that should have been used.[24]

## C.

Having rejected the government's argument that Exhibit 22A was not offered to prove the truth of the matters asserted, we now must determine whether the notes were properly admitted under any exception to the hearsay rule. The trial court originally admitted Exhibit 22A under the business records exception of Fed.R.Evid. 803(6).[25]

■ It is concluded that under this rule no proper foundation was laid for the admission of the handwritten notes of Exhibit

23. The trial transcript reveals that when government counsel intended to restrict the use of out-of-court statements to non-hearsay purposes, he so expressed his intentions to the court and opposing counsel. Thus, following defense objections to the admission of Exhibit 22B, a newspaper article, government counsel stated:

Well, Your Honor, I'm not offering it to prove any assertion contained in the article. I'm offering it to prove these defendants' intent. They exhibited a great interest in fraud and the prosecution of fraud, and I think I can argue from that that they were, in fact, engaged in fraud, as evidenced by their keen interest.

I'm not offering to prove one single thing stated in that article, and the jury can be instructed accordingly.

Had government counsel similarly intended to use Exhibit 22A solely for non-hearsay purposes, and not to prove the truth of the matters asserted, then the government's intent should have been explained to the court and defense counsel so that an appropriate limiting instruction could have been requested.

24. This is not to say that all of the statements contained in the notes were offered to prove the truth of the matters asserted. The government is thus correct that some of the entries, such as "Don't appear nervous" or "do not volunteer anything" or "Provide no information w/o advice of lawyer," appear to derive their evidentiary value by showing the defendants' awareness of and concern about an investigation into the Clinic, but do not appear relevant for the truth of the matters asserted.

25. Counsel for the Clinic stated:

Your Honor, I don't see how four pages of Dr. Wally Mahar's writings could constitute coconspirator hearsay. He's not a coconspirator.

The court responded:

Well it doesn't matter at this point whose writing. It's a file with four pages of handwritten notes found among the business records. The court is going to receive [Exhibit 22A].

22A. The only evidence in the record regarding the notes is 1) the testimony of FBI agent Walter that they were found in room 6 along with "miscellaneous business records" and 2) the testimony of the handwriting expert that Walter V. Mahar authored three pages of notes and that five pages of notes were in the handwriting of Dr. Wally Mahar.

It is apparent that this testimony, standing alone, fails to satisfy the requirements of Rule 803(6). There is no evidence in the record, as the rule requires, as to whether the notes were "kept in the course of a regularly conducted business activity," or whether "it was the regular practice of that business activity to make" the notes. The absence of any testimony by someone with personal knowledge of the defendant Clinic's recordkeeping practices and the circumstances under which the notes were recorded clearly establishes that the business records exception was not satisfied in this case.[26] *See United States v. Hathaway*, 798 F.2d 902, 906, (6th Cir.1986) (holding that under Rule 803(6), the witness must "be familiar with the record keeping system"); *Calhoun v. Baylor*, 646 F.2d 1158, 1162 (6th Cir.1981) (holding that "Rule 803(6) is inapplicable because the witness, Hockhauser, played no role in the creation or compilation of the records and was therefore in no position to attest to their reliability").

After making its ruling that the Exhibit 22A notes were business records, the trial judge appears to have shifted the basis for admissibility to the coconspirator exception of Rule 801(d)(2)(E). Thus, following receipt of the handwriting expert's testimony the court found that the "government had demonstrated the existence of a conspiracy, and that the defendants before the court were members" of the conspiracy.[27] We now turn to consideration of whether Exhibit 22A was properly admitted under the coconspirator exception of Rule 801(d)(2)(E). This rule provides that a statement "is not hearsay if . . . offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

■ The trial court's findings that a conspiracy existed and that the defendants against whom Exhibit 22A was offered were members of the conspiracy, clearly satisfied the first two prongs of *United States v. Enright*, 579 F.2d 980, 986 (6th Cir.1978).[28] However, review of the record

---

**26.** Walter V. Mahar, as seen, was secretary-treasurer of the Clinic corporation and shared management responsibilities with Shannon Mahar. However, there is no evidence in the record that tied Dr. Wally Mahar to the operation of the Clinic, either during the period of the conspiracy or at any previous time. Thus, while the documents in the handwriting of Walter V. Mahar might be treated as admissible Clinic business records, had other requirements of Rule 803(6) also been satisfied, the documents in the handwriting of Wally Mahar could not have been treated as Clinic business records on the present record.

**27.** The government first offered Exhibit 22A on the fourth day of the trial, January 9, 1985, during direct examination of FBI special agent David A. Hervey. Government counsel explained that he was "offering it as coconspirator hearsay." Counsel for defendant Inner-City Medical Services objected on several grounds. After further discussion by government counsel and counsel for the several defendants, the trial judge stated:

> I think if we had identified a writer it would be admissible in every other respect. It's ob-

viously in furtherance of a conspiracy substantially identical to this one. . . . But if we have the handwriting identification, it would be admissible, but this isn't.

On February 7, 1985, at the conclusion of the handwriting expert's testimony, the government rested. Shortly thereafter, the trial judge made the following statement:

> First of all, I do find that the government has demonstrated the existence of a conspiracy, and that the defendants before the court were members of the conspirators [sic], by preponderance of the evidence, at least.

**28.** In *Enright* this court held that for statements to be admissible under this rule the government must establish by a preponderance of the evidence:

> 1) that a conspiracy existed;
> 2) that the defendant against whom the hearsay is offered was a member of the conspiracy; and
> 3) that the hearsay statement was made in the course of and furtherance of the conspiracy.

*See also United States v. Howard*, 770 F.2d 57, 59 (6th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1213, 89 L.Ed.2d 325 (1986).

reveals that the trial judge made no findings as to whether Walter V. Mahar and Dr. Wally Mahar, the identified authors of eight of the 12 pages of notes, were members of the conspiracy, or as to whether the hearsay statements were made by either or both in the course of and in furtherance of the conspiracy.[29] Thus, the trial judge did not satisfy the third *Enright* requirement. Since the trial judge did not make findings that would satisfy all three of the *Enright* requirements the trial judge erred in admitting into the evidence the notes comprising Exhibit 22A as coconspirator statements. (Admission of these notes as business records was also erroneous, as held above.)

More particularly, the trial judge erred in failing to make findings as to the time and circumstances under which the notes were written by Dr. Wally Mahar and Walter V. Mahar. Counsel for defendant Shannon Mahar requested the right to call Dr. Wally Mahar out of the jury's presence to show that the notes were "authored in February and March of 1977." Counsel stated that Dr. Wally Mahar would swear to counsel's comments that this "was the date of a Medicaid audit" and that "on three different dates in March of 1977, they came to the Clinic; they obtained certain records for the purpose of review."[30] Counsel's request to call Dr. Wally Mahar to the witness stand for this purpose, and his request for reconsideration of the court's ruling admitting the notes, were denied. In denying defendant Shannon Mahar's motion for reconsideration of the admission of Exhibit 22A, the court stated:

> You are certainly free to put all of the explanations of the evidence before the jury as part of your defense case, but if there is reference to computers, there certainly isn't any clear mistake that has been made or miscarriage of justice, and certainly you knew as much about who the author was three months ago as you have learned now.

It was no answer for the court to say that the defendants were "free to put all of the explanations of the evidence before the jury as part of your defense case." *Enright* specifically teaches that the admissibility of coconspirators' statements pursuant to Rule 801(d)(2)(E) is for the court to decide under Rule 104(a):

> We reaffirm our view that the trial court should have sole responsibility for ruling on the admissibility of evidence.

579 F.2d at 987. Thus the question was not for the jury. The court should have permitted the defendants to call Dr. Wally Mahar and should have received any other evidence that was relevant to show the time and circumstances under which the

---

*United States v. Vinson,* 606 F.2d 149, 152 (6th Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980), sets forth "alternative" procedures that a district court may adopt in "structur[ing] conspiracy trials." It is not clear which of the three procedures the trial judge sought to follow in this case, although it appears the court may have attempted to conform to the third, in which the judge "may admit the hearsay statements subject to later demonstration of their admissibility by a preponderance of the evidence." *Vinson,* 606 F.2d at 153.

29. Later in the day, following the colloquy reported *supra* note 27, the court and government counsel engaged in this colloquy:

> THE COURT: Are you going to ask me to find that the statements of coconspirators were made in the course of and in furtherance of the conspiracy?
> MR. ROBINSON: Yes, Your Honor. I'm sorry. I though the Court had already made that ruling.

> THE COURT: No, just that the conspirators [sic] appeared to exist by a preponderance of the evidence, and that these persons appeared to be members of it by a preponderance. I hadn't made any finding until now about their statements.
> MR. ROBINSON: I would ask the Court to so find.

At this point, counsel for defendant Oliver raised another subject and the court made no finding.

30. The Exhibit 22A notes speak of Medicaid representatives coming to the Clinic on "Thursday, the 24th," and also refer to "After Thursday," and "Thursday." The 1977 calendar reveals that in both February and March of that year the 24th of the month fell on a Thursday. This fact offers some corroboration of the representation made by defense counsel, although it is not conclusive, since in the period of the alleged conspiracy (January 1981 through June 1983) the 24th fell on a Thursday six times.

notes were prepared. Only in that way could the court meet its sole responsibility to determine the admissibility of Exhibit 22A pursuant to Rule 801(d)(2)(E) and *Enright.*

The court's failure to make the required *Enright* finding, a responsibility that devolved on the court, was clearly an abuse of discretion. This is the standard under which evidential errors of a trial court are tested on appeal. *Mitroff v. Xomox Corp.,* 797 F.2d 271, 275 (6th Cir.1986). The remedy for the trial judge's abuse of discretion in admitting Exhibit 22A is articulated, *infra,* in part *VI.*

### III.

#### A.

As another ground of error, defendant Shannon Mahar argues that the trial court erred in quashing the defense subpoena ad testificandum of Dr. Kay. After the government rested and Dr. Kay was acquitted by the court, counsel for defendant Riley Mahar issued a subpoena for Dr. Kay to appear as a defense witness.

Out of the presence of the jury, counsel for Dr. Kay informed the court that Dr. Kay would assert the Fifth Amendment right against self-incrimination to all questions if called to the witness stand. Citing an affidavit of Dr. Kay,[31] government counsel countered that if Dr. Kay testified as represented by defense counsel, "it would expose [Dr. Kay] to some liability

under state perjury statutes." The trial judge thereafter concluded that there "is no way, apparently, to have coextensive examination, cross-examination of Dr. Kay." Consequently the court quashed the Dr. Kay subpoena.

It is argued on appeal that the trial judge erred in quashing the subpoena without requiring Dr. Kay to first take the witness stand.[32] As defendants correctly point out, the law of this circuit requires the subpoenaed witness "to take the witness stand and assert the [Fifth Amendment] privilege in response to particular questions." *United States v. Stephens,* 492 F.2d 1367, 1374 (6th Cir.), *cert denied,* 419 U.S. 852, 95 S.Ct. 93, 42 L.Ed.2d 83 (1974). Most recently, this circuit explained:

> A blanket assertion of the privilege by a witness is not sufficient to meet the reasonable cause requirement and the privilege cannot be claimed in advance of the questions. The privilege must be asserted by a witness with respect to particular questions, and in each instance, the court must determine the propriety of the refusal to testify.

*In re Morganroth,* 718 F.2d 161, 167 (6th Cir.1983).

Under these well-settled Sixth Circuit principles, it is clear that the trial court should have required Dr. Kay to take the witness stand and to assert his claim of Fifth Amendment privilege in response to particular questions. The trial court then

---

**31.** Insisting he had the right to have the witness testify, counsel for Riley Mahar summarized as follows the testimony he expected to elicit from Dr. Kay:

> I have a right to have witnesses who would testify in this matter to explore that doctor relationship.... [Dr. Kay] will testify based on my interview with him that he treated these patients, that he felt competent to do it, that when they left he knew that they were going to get a prescription filled, and that he authorized that.

Thereafter, government counsel brought to the attention of the court and defense counsel an affidavit of Dr. Kay. Government counsel explained:

> [I]f Dr. Kay takes the stand and says that he ordered these tests and these medications, I would then be compelled to confront him

with his affidavit which he filed with the state authorities which said to the contrary.

**32.** In connection with this argument, the defendants urge this court to overrule or modify Sixth Circuit precedent that holds that a district court has no authority to grant immunity to a witness who asserts the Fifth Amendment privilege. *See United States v. Pennell,* 737 F.2d 521, 527 (6th Cir.1984), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985); *United States v. Gullett,* 713 F.2d 1203, 1209 (6th Cir. 1983), *cert. denied,* 464 U.S. 1069, 104 S.Ct. 973, 79 L.Ed.2d 211 (1984); *United States v. Lenz,* 616 F.2d 960, 962 (6th Cir.), *cert. denied,* 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980). We respectfully decline to overrule or modify these decisions.

would have been in a proper position to determine the validity of the claimed privilege, and to order the witness to answer "if it clearly appear[ed] that he [was] mistaken as to the justification for the privilege." *Morganroth,* 718 F.2d at 167.

Although the trial court could have required Dr. Kay to assert his claim of privilege in response to particular questions, we note that defense counsel failed to request that the court follow such a procedure. Thus, it is questionable whether this asserted ground of error was properly preserved for appeal. Nevertheless, we will consider this claimed ground of error.

■ Initially, we observe that had Dr. Kay been required to assert his Fifth Amendment privilege in response to particular questions, it appears that there would have been at least a colorable basis for the claimed privilege with respect to questions regarding his conduct as the Clinic's doctor during the years covered by the indictment. Even though Dr. Kay would not have been subject to further federal prosecution, it appears that there would have been more than "a mere imaginary, remote or speculative possibility of prosecution," *Morganroth,* 718 F.2d at 167, under Michigan law. As explained by the Supreme Court of Michigan in *People v. Formicola,* 407 Mich. 293, 284 N.W.2d 334, 336 (1979), the double jeopardy clause of the Michigan Constitution does not bar state prosecutions subsequent to federal prosecutions for offenses arising out of the same act where the interests of the two forums are "substantially different." Of course, the trial court would have been in a better position to make the determination of whether the interests of the two forums were "substan-

tially different"; we cite this standard simply to show that there would have been at least a colorable basis for Dr. Kay to fear prosecution under Michigan law and to assert his Fifth Amendment privilege.

We further observe that had Dr. Kay been denied his claims of privilege and been required to testify, it is difficult to see how his testimony would have aided the defendants. Defense counsel proffered to the court that Dr. Kay would state that "he treated [his] patients, that he felt competent to do it, that when they left he knew that they were going to get a prescription filled, and that he authorized that."

Had Dr. Kay testified as thus represented,[33] it is evident that government counsel would have sought to impeach Dr. Kay using the doctor's own affidavit statements to the contrary. Moreover, had Dr. Kay testified as proffered by defense counsel, such testimony would not in any way have contradicted or detracted from the overwhelming evidence in the record that Dr. Kay's examinations of patients were medically substandard, and that controlled substances were regularly issued outside the course of usual medical practice and for no legitimate medical purpose. Nor would such testimony in any manner have diminished the criminal responsibility of Shannon Mahar, Riley Mahar or the Clinic on the conspiracy charge or the various alleged distribution of controlled substances charges.

Defendant Shannon Mahar contends that the need for the defendants to question Dr. Kay was heightened by his acquittal at the close of the government's case. It is thus argued that following Dr. Kay's acquittal,

---

**33.** On appeal, defendant Shannon Mahar states that "several concepts" could have been established by examination of Dr. Kay. For example, he claims that it "would have been established that Kay's disregard for medical necessity was not management oriented."

This representation and others in defendant's brief regarding what Dr. Kay would have stated at trial are outside the trial record and are thus not considered on this appeal. As seen, the proffer made to the trial court was limited to the statement set forth above.

The need to make any further proffer became important when the trial court denied defense counsel's request to "make a record of what we would have elicited by having Dr. Kay respond to questions outside the presence of the jury." Even though denied the opportunity to make a record through testimony of Dr. Kay, defense counsel nonetheless could have made a representation for the record regarding Dr. Kay's expected testimony.

"the jurors would readily 'presume' that the Appellant must have been responsible for Kay's failings."

With respect to this argument, we note first that the jury was instructed as follows concerning agent Beranie's testimony as to what Dr. Kay had told him:

> I will further instruct you at this time that you may only consider his statement to agent Beranie as against him, and you may not consider that statement against any other defendant in the case who is still before you.

Later, the court further instructed the jury as to Dr. Kay:

> [T]he case has been disposed of as to Dr. Stephen B. Kay, Walter Mahar and Maurice Norris. They are not of concern to you as defendants. Their disposition should not control or influence your verdict with reference to the remaining defendants, and you must base your verdict to each of them solely on the evidence against each.

These instructions clearly and properly directed the jury not to be influenced either by Dr. Kay's statement [34] or by the disposition of the charges against Dr. Kay or the other defendants no longer in the case.

█ Moreover, upon review of all the evidence we must reject the contention that the convictions of the defendants on the conspiracy count and the various substantive counts were based on "spillover" from the dismissal of Dr. Kay. The evidence, viewed in its entirety, clearly supported the jury in finding each of the defendants themselves criminally responsible for the illegal drug distribution conspiracy. While it is true that Dr. Kay's examination of patients was an important focus of the trial testimony, it is abundantly clear that the conspiracy was directed by Shannon Mahar and Walter V. Mahar, with the collaboration and support of Riley Mahar, and that it involved far more employees than just Dr. Kay. For example, the conspiracy depended upon the prescribing and dispensing of controlled substances and the selection of testing procedures by employees at the pink chair. Even though Dr. Kay circled on the patient's chart preprinted letters indicating pain, diet, nerves or cold, the employee at the pink chair actually selected the controlled substance to be sold to the patient. The conspiracy also required the cooperation and participation of the pharmacy in filling the prescriptions for controlled substances. The pharmacy, as seen, would keep the employee at the pink chair informed as to the availability of drugs in stock. In addition, the evidence permitted a finding that persons in the pharmacy signed the prescriptions in the name of Dr. Kay. All this evidence, along with all the other evidence at trial, provided a convincing basis for the jury to find the defendants themselves criminally responsible for the count 1 conspiracy, and, as principals or aiders and abettors, for the various substantive counts.

In sum, for all the reasons stated herein we conclude that no "fundamental rights were affected by the court's ruling" [35] quashing Dr. Kay's subpoena. Accordingly, this ground in support of defendants' appeal provides no basis for reversing defendants' convictions.

**B.**

As his final claim of error, defendant Shannon Mahar cites the refusal of the trial court to give a requested instruction

---

**34.** Agent Beranie testified that when he asked Dr. Kay about his responsibilities, Dr. Kay stated: "Examine patients." When asked "what type of patients," Dr. Kay answered that he "examine[s] patients who requested diet or pain medications," and that he "did prescribe medications."

Because the trial court properly instructed the jury that Dr. Kay's statement could not be considered against any other defendant, it is apparent that Dr. Kay was not a "witness[ ] against" them within the meaning of the Sixth Amendment's Confrontation Clause. We therefore reject the claim that the Confrontation Clause was offended by the quashing of the Dr. Kay subpoena.

**35.** *United States v. Arnott,* 704 F.2d 322, 325 (6th Cir.), *cert. denied,* 464 U.S. 948, 104 S.Ct. 948, 78 L.Ed.2d 325 (1983) (quoting *Stephens, supra,* 492 F.2d at 1374).

as a substitute for the following instruction that the court gave the jury:

Stephen B. Kay is a physician. It is therefore a defense to the charges in this indictment that the controlled substances were prescribed by him, if they were prescribed, unless the government proves beyond a reasonable doubt that they were not prescribed for a legitimate medical purpose in the usual course of his professional practice.

During colloquy between the court and counsel concerning proposed jury instruction 65 of the court's draft charge, defendant Shannon Mahar's counsel requested the following instruction as a substitute for the proposed instruction:

I don't think that's the standard, Your Honor. There has to be a—that should read, " ... Unless the government proves beyond a reasonable doubt that they were not prescribed for a legitimate medical purpose in the usual course of his professional practice, and the other individual defendants knew beyond a reasonable doubt that the prescription was outside the usual course of medical practice and was not written for a legitimate medical purpose, and each defendant had a specific intent to do that which the law forbids."

THE COURT: Well, I'm going to leave 65 as it is.

As is seen, the requested instruction added to the court's instruction the element that "the other defendants" knew that Dr. Kay's prescription of controlled substances was "outside the usual course of medical practice and was not written for a legitimate medical purpose." While the court did not mention the required knowledge element in the challenged charge, three pages later the court specifically charged that "actual knowledge of the kind of controlled substance which was possessed with intent to distribute, or was distributed by

the conspiracy, is an essential element of the offense charged." This was given in conjunction with an instruction stating that for distribution of controlled substances to be a violation of 21 U.S.C. 841(a)(1), "said distribution or transfer must be outside the law."

It is also noted that after its "actual knowledge" instruction, the court thus elaborated this "essential element."

You may not find an individual defendant guilty of conspiracy to distribute a specific kind of controlled substance unless you find beyond a reasonable doubt that he was a member of the conspiracy and that he knew that that specific kind of controlled substance was being possessed with the intent to distribute and/or distributed by the conspiracy. It is not sufficient to show that an individual defendant may have suspected or thought that a specific controlled substance was being possessed with the intent to distribute and/or distributed by the conspiracy.

Moreover, the court gave a cautionary instruction "that the law clearly permits a physician to prescribe and a pharmacist to fill prescriptions for controlled substances in the usual course of medical practice for legitimate medical purposes." [36]

■ The court's instructions must be "judged as a whole." *Berrier v. Egeler,* 583 F.2d 515, 518 (6th Cir.), *cert. denied,* 439 U.S. 955, 99 S.Ct. 354, 58 L.Ed.2d 347 (1978). *See also Cupp v. Naughten,* 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). Particular "jury instructions in a criminal case should not be analyzed in isolation, but rather must be evaluated in the context of the overall charge." *United States v. Gray,* 790 F.2d 1290, 1297 (6th Cir.1986). Considered and judged as a whole, the court's total charge gave the jury all of the elements contained in de-

---

36. The conspiracy instructions also applied to the substantive illegal distribution counts. The jury was thus told at another point:

If you find that a particular defendant is guilty of conspiracy as charged in count 1, you may also find that defendant guilty of a

substantive offense as charged in any of counts 2 through 16 of the indictment, provided that you find that the essential elements of the count, as defined in these instructions, have been established beyond [a] reasonable doubt....

fendants' requested instruction.[37] It was not error to refuse defendants' request.

## IV.

### A.

Riley Mahar contends that the trial court erred in finding that *Miranda* warnings were not required at the time of his interview by FBI special agent Diane Bennett, which occurred during the FBI search of the Clinic's premises on February 14, 1983. Over Riley Mahar's objections, the court permitted agent Bennett to testify at trial as to his statements made to her during the interview.

The Fifth Amendment of the United States Constitution provides: "No person ... shall be compelled in any criminal case to be a witness against himself...." In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the Supreme Court held that this constitutional guarantee prevents the government from using any statement against a defendant in a criminal case "stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." The Court explained that "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* A person being questioned in "custodial interrogation" must be warned "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney...." *Id.*

In its recent decision in *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the Supreme Court elaborated upon the meaning of "custodial interrogation." The *Berkemer* Court rejected the contention that *Miranda* rights

do not attach until a person is formally placed under arrest. Thus, it was determined that "a motorist who has been detained pursuant to a traffic stop [who] is subjected to treatment that renders him 'in custody' for practical purposes, ... will be entitled to the full panoply of protections prescribed by *Miranda*." *Id.* at 440, 104 S.Ct. at 3151. For purposes of deciding whether a person was "in custody" at a particular time, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Id.* at 442, 104 S.Ct. at 3152. *See United States v. Reynolds*, 762 F.2d 489, 493 (6th Cir.1985) (applying the "reasonable man" test of *Berkemer*); *United States v. Gillyard*, 726 F.2d 1426, 1429 (9th Cir.1984) (holding that a "suspect is in custody and entitled to *Miranda* warnings, if under the circumstances a reasonable person would believe that he is not free to leave").

It is undisputed in this case that the now-familiar *Miranda* warnings were not given to Riley Mahar either prior to or during his interview with agent Bennett. The question, therefore, is whether he was subjected to "custodial interrogation" within the meaning of *Miranda* and *Berkemer*. The search of the Clinic, as it relates to Riley, and the circumstances of his interview, are now reviewed.

On the afternoon of February 14, 1983, armed FBI and DEA agents, along with uniformed Detroit police officers, searched the Clinic pursuant to a search warrant. In all, there was a total of approximately 20 law enforcement officers. Riley Mahar, in the pharmacy at the time of the officers' arrival at the Clinic, heard a "loud pounding." Pushing open the pharmacy door, he was met with a gun aimed at him by one of the agents. He and other employees were informed "This is the FBI" and were directed to raise their hands and place them against the wall of the waiting room. When he uttered a statement to the person

---

**37.** The requested instruction ended by stating that "each defendant had a specific intent to do that which the law forbids." This would have been repetitive since earlier the court instructed the jury that the "crimes charged in this case are serious crimes which require proof of specific intent before a defendant may be convicted."

next to him, he was swatted on the head with a "hard" object and told to "shut up."

Riley estimated his hands were raised against the wall for about twenty minutes. During this time he was patted down, as were other employees. Once he was permitted to drop his hands, it was another ten to twenty minutes before he was taken to the corner of the waiting room for identification and photographing.

After his identification, Riley, as the pharmacist, was then taken to the pharmacy and asked to open the safe. For the next 10 minutes he remained in the pharmacy with three agents, and was unable to move about. Next, one of the agents escorted Riley to a doctor's examining room for an interview with agent Diane Bennett. She informed Riley that she was taking a statement pursuant to the search warrant. He was told neither that he had the right to consult a lawyer, that he need not submit to the interview, nor that he was free to leave the Clinic.

The door to the interview room was ajar throughout the interview, and agents were standing just outside the door. The interview was completed in less than half an hour. At its conclusion, Riley was taken by one of the agents back to the pharmacy.

■ In light of all the circumstances surrounding his detention, we find that a "reasonable person" in Riley's position would not have felt free to leave the Clinic prior to or during his interview.[38] As seen, prior to being interviewed by agent Bennett, Riley was detained by armed agents first in the Clinic waiting room, and then in the pharmacy. At no point was he advised that he could leave the Clinic. Under all the circumstances, as described above, we thus conclude that at the time he was interviewed Riley Mahar was "in custody" under *Miranda*. Because he was not given

the *Miranda* warnings, his statement to agent Bennett should not have been admitted at trial.

The remaining question is whether the admission of Riley Mahar's statements, submitted through the trial testimony of agent Bennett, constitutes reversible error. The effect of the admission at trial of Riley Mahar's statements must be judged under the "harmless error" analysis of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Under *Chapman*, as the Supreme Court recently reiterated, an otherwise valid conviction should not be set aside if the reviewing court determines that the error "was harmless beyond a reasonable doubt." *Rose v. Clark*, —— U.S. ——, ——, 106 S.Ct. 3101, 3105, 92 L.Ed.2d 460 (1986). Under this test, the question this court must ask is whether absent the improperly admitted statements, "is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?" *United States v. Hasting*, 461 U.S. 499, 511, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983). In answering this question, we must consider the entire record. *Id.* at 509 n. 7, 103 S.Ct. at 1981 n. 7.

■ Upon consideration of the entire record, we conclude that the introduction at trial of Riley Mahar's statements to agent Bennett constitutes harmless error. First, with respect to Riley's statement that he was "partially one of the [Clinic's] managers," we note that uncontroverted evidence established that he asserted a 25% ownership in the Clinic. *See supra* note 1. In addition, one employee, Vanessa Goodrum, named Riley Mahar as one of the people from whom she took orders.

Moreover, the evidence clearly established that Riley managed the Clinic pharmacy. As the licensed pharmacist, he di-

---

**38.** We apply the "clearly erroneous" standard of review in reaching this decision. *See United States v. Ross*, 719 F.2d 615, 621 (2d Cir.1983); *United States v. Gaines*, 563 F.2d 1352, 1359 (9th Cir.1977); *United States v. Planche*, 525 F.2d 899, 900 (5th Cir.1976).

In determining that *Miranda* warnings were not required, the trial judge erroneously focused on whether Riley Mahar's statement was "voluntary," rather than on whether he was "in custody" for *Miranda* purposes. Had the trial judge addressed the custody issue, any finding that Riley was not in custody at the time of his interview would have been "clearly erroneous."

rected the operation of the pharmacy and was responsible for the purchase and distribution of all the pharmacy's controlled substances. He played an essential role in the overall controlled substances distribution conspiracy charged in count 1. There is ample evidence that linked him as a member of the conspiracy and rendered him responsible in carrying out the conspiracy purpose, the actual illegal distribution of Schedule II, III and IV controlled substances outside of the usual course of medical practice. In view of this evidence at trial it is evident that Riley's statement that he was "partially one of the [Clinic] managers" was cumulative to other evidence upon which the jury could have made its findings of Riley's guilt on count 1.

Riley also objects to the admission of his statement describing the procedures followed by patients attending the Clinic. Agent Bennett testified as follows:

Q. What was the process that he described?

A. A patient would come into the clinic and would sign in at the receptionist desk. And then the patient's name would be entered in a computer, and this computer would show whether the patient had been in the clinic before.

The patient would be seated in the waiting room, and then the patient would see one of the doctors at the clinic.

The patient would receive whatever medical testing was necessary, some of the testing was done right there at the clinic, and then the patient might see the doctor then, and may or may not receive a prescription.

And then the person would present the prescription at the pharmacy, and they would be issued what was called a will-call ticket so that they could pick up their medication sometime during that day.

It is difficult to see how this statement could have had any prejudicial effect upon the jury. The statement contains no admissions of guilt or wrongdoing.[39] Further, the evidence reviewed above shows the linkage between the selection of drugs made at the pink chair and the pharmacy. As discussed, the pharmacy kept the pink chair employees advised as to the drugs available for selection and prescription. As pharmacist, Riley was bound to know about this routine procedure.

Finally, Riley objects to admission of his statement that he "had seen [Clinic doctors] perform physical exams." There is no indication in this statement as to when or how often Riley had seen physical examinations performed. Nor does the statement specify which doctor or doctors Riley had observed. And nothing in the statement suggests that the examinations seen by Riley were substandard, or that Riley knew substandard medical examinations were being performed.

Having reviewed the statements attributed to Riley Mahar by agent Bennett, we conclude that introduction of such statements was harmless beyond a reasonable doubt. As seen, none of the statements contained incriminating admissions of involvement in the drug distribution conspiracy or any of the substantive distribution counts. More importantly, setting aside the improperly admitted statements, we find that there is clearly sufficient evidence in the record, as detailed in part I.B. *supra*, to support Riley Mahar's convictions on the conspiracy count and the various illegal distribution counts. We therefore conclude that absent the improperly admitted statements, it is clear beyond any reasonable doubt that the jury would have returned the same convictions against defendant Riley Mahar on the conspiracy count and the various substantive counts.

**B.**

▮ Riley Mahar also asserts as error the trial court's inclusion in the jury charge

---

**39.** To the contrary, agent Bennett quoted Riley as saying that the patient "would receive whatever medical testing was necessary," and "may or may not receive" a prescription for drugs. Neither these statements nor the others related by agent Bennett in any way implicated Riley in a conspiracy to illegally distribute controlled substances.

**1502**

of various federal and state regulations regarding pharmaceutical practices.[40] In considering this asserted ground of error, we must consider whether "the instructions, when taken as a whole, ... creat[ed] a substantial likelihood that defendants would be convicted of a crime not alleged in the indictment." *United States v. Gray, supra,* 790 F.2d at 1297. Viewing the instructions as a whole we conclude that the jury was properly instructed as to the elements of the conspiracy count and the distribution counts, and that there was no "substantial likelihood" that defendants were convicted of crimes for which they were not charged.[41] This claimed ground of error is thus denied.

**C.**

As his final ground of error, Riley Mahar asserts that the trial court erred in denying his motion for severance and a separate trial. In this circuit, the "general rule in conspiracy cases is that persons indicted together should be tried together." *United States v. Licavoli,* 725 F.2d 1040, 1051 (6th Cir.), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984) (citing *United States v. Robinson,* 707 F.2d 872, 879 (6th Cir.1983)). In order to establish that the trial court abused its discretion, a defendant "must make a strong showing of prejudice" and "must demonstrate an inability by the jury to separate and treat distinctively evidence that is relevant to each particular defendant on trial." *United States v. Day,* 789 F.2d 1217, 1224 (6th Cir.1986) (quoting *United States v. Gallo,* 763 F.2d 1504, 1525 (6th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 826, 88 L.Ed.2d 798 (1986)).

We conclude that Riley Mahar has failed to establish "actual prejudice" by the denial of his motion for severance. Most significantly, the jury clearly demonstrated its ability to consider the evidence separately against the various defendants. Thus, although Shannon Mahar was convicted on all but one of the mail fraud counts, and the Clinic on all 15 of the mail fraud counts, Riley Mahar was exonerated on all the mail fraud charges.[42] These differences in the verdicts illustrate that the jury was able to "compartmentalize the evidence as it relates to separate defendants...." *United States v. Thomas,* 728 F.2d 313, 319 (6th Cir.1984) (quoting *United States v. Gaines,* 563 F.2d 1352, 1355 (9th Cir.1977)). Accordingly, we find that the trial court did not abuse its discretion in denying Riley Mahar's motion for severance and separate trial.

**V.**

**A.**

The Clinic, as its first asserted ground of error, contends that "governmental misconduct which occurred throughout the trial" denied the defendants a fair trial. Included among the claims of improper conduct is government counsel's alleged comment during closing argument on the defendants' failure to testify. Defendant cites the following statements of government counsel in support of this claim:

—See if there is an explanation that is innocent for that particular Exhibit [22A].

—Insist that the defense address themselves to the facts shown by the evidence....

**40.** No objection is made to the court's inclusion of 21 C.F.R. § 1306.04, which provides in pertinent part:

(a) A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescriptions.

**41.** A nearly identical issue was raised, and rejected on appeal, in *United States v. Irwin,* 661 F.2d 1063, 1069–70 (5th Cir.1981), *cert. denied,* 456 U.S. 907, 102 S.Ct. 1754, 72 L.Ed.2d 164 (1982).

**42.** Another indication of the jury's ability to treat each defendant separately is the fact that three of the defendants, Kent Oliver, Maurice Norris, and Terrence Mahar, were acquitted of all charges against them.

—Require the defense to address the fact that patients weren't allowed to return to Inner-City prior to the expiration of 14 days....

In considering these comments, we note first that the court expressly informed the jury that the law does not compel a defendant in a criminal case to take the witness stand and testify. Moreover, it is determined that the statements cited above were, at most, "indirect comments," and are thus analyzed under this four part test:

1) Were the comments "manifestly intended" to reflect the accused's silence *or* of such a character that the jury would "naturally and necessarily" take them as such;

2) Were the remarks isolated or extensive;

3) Was the evidence of guilt otherwise overwhelming;

4) What curative instructions were given, and when.

*Spalla v. Foltz,* 788 F.2d 400, 404 (6th Cir.1986) (emphasis in original).

■ Applying each of these factors in this case, we find that the comments cited above did not in any way impinge upon defendants' Fifth Amendment right against self-incrimination, and thus provide no basis for overturning their convictions.

The remaining asserted "prosecutorial misconduct" is judged in accordance with the following standard:

To warrant a new trial ... prosecutorial misconduct "must be so pronounced and persistent that it permeates the entire atmosphere of the trial."

*United States v. Thomas, supra,* 728 F.2d at 320 (quoting *United States v. Lichenstein,* 610 F.2d 1272, 1281 (5th Cir.), *cert. denied sub nom., Bella v. United States,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980)). We have considered the several asserted claims of prosecutorial misconduct, and upon review of the entire record conclude that any improper conduct of government counsel that occurred at trial constitutes harmless error. *See United*

States v. Krebs, 788 F.2d 1166 (6th Cir. 1986).

**B.**

Finally, two related claims of error are raised by the Clinic. First, it is claimed that evidence admitted at the trial constituted an impermissible variance from the charges in the indictment. As this court recently observed, "a conviction cannot stand if it is based on an offense which is not charged in the grand jury's indictment." *United States v. Gray, supra,* 790 F.2d at 1297 (citing *United States v. Miller,* 471 U.S. 130, 105 S.Ct. 1811, 1819, 85 L.Ed.2d 99 (1985)).

■ Upon consideration of the entire record, we are convinced that any error in admitting testimony or evidence outside the scope of the indictment was harmless. *See United States v. Ismail,* 756 F.2d 1253, 1259–61 (6th Cir.1985). Therefore, we reject this claimed ground of error.

■ Similarly, we reject the defendants' claim that the trial court's denial of their motion for a bill of particulars constitutes reversible error. The indictment set forth the charges in considerable detail, and the denial of the request for a bill of particulars was not an abuse of the trial court's discretion. *United States v. Largent,* 545 F.2d 1039, 1043–44 (6th Cir.1976), *cert. denied,* 429 U.S. 1098, 97 S.Ct. 1117, 51 L.Ed.2d 546 (1977); *United States v. Birmley,* 529 F.2d 103, 108 (6th Cir.1976).

**VI.**

■ We held in part II.C. that Exhibit 22A was improperly admitted at trial. It is now determined that the case must be remanded to the trial court to conduct the inquiry that should have been made under Rule 801(d)(2)(E). An appellate court is not the proper forum to conduct the needed factual hearing required under *Enright* and *Vinson.* Recently faced with a nearly identical problem in *United States v. Holloway,* 731 F.2d 378, 382 (6th Cir.1984), the court remanded the case to the district court "to make the appropriate *Enright* finding." We believe this is the proper

approach in this case as well, considering the need for the court to make a proper factual finding under the third prong of *Enright.*

In the event the trial court determines on remand that the notes in Exhibit 22A were made in the course of and in furtherance of the conspiracy,[43] the convictions of the defendants would stand and we would retain jurisdiction of this case in order to review the trial court's *Enright* finding.

If the trial court determines that the notes were not authored by coconspirators in the course of and in furtherance of the conspiracy, we conclude that the conviction of defendant Shannon Mahar on count 17 and counts 18 and 20–32, and of defendant Clinic on counts 18–32, must be set aside and a new trial granted the defendants on these counts.

██ We reach this conclusion—that such convictions must be reversed if it is determined that the notes were not written in the course and in furtherance of the conspiracy—under the "harmless error" analysis of *Chapman v. California, supra.* Applying this test in the instant case, we conclude, in light of the incriminating nature of the statements contained in Exhibit 22A and the government's emphasis on such statements during closing and closing rebuttal argument, as reviewed above, that the admission of Exhibit 22A was not harmless beyond a reasonable doubt. Thus, the statements contained in the notes

bear directly on the alleged scheme to defraud Medicaid and Blue Cross/Blue Shield,[44] and may have played a significant role in the jury's convictions on the mail fraud counts. Whatever reasonable doubts the jury may have maintained about defendant Shannon Mahar's guilt and the Clinic's guilt on these counts could well have been overwhelmed by, as government counsel put it during closing argument, "powerful" evidence "from the defendants' own mouths." For this reason we cannot conclude, with respect to the mail fraud counts, that admission of Exhibit 22A was harmless beyond a reasonable doubt.

Likewise, the statements in Exhibit 22A may have influenced the jury in convicting Shannon Mahar under count 17 of conducting a continuing criminal enterprise. The charges in the mail fraud counts, on which Shannon Mahar stands convicted, are clearly intertwined with the continuing criminal enterprise charge. Having concluded that the admission of Exhibit 22A was not harmless beyond a reasonable doubt as to the mail fraud counts, we similarly conclude that admission of the exhibit was not harmless beyond a reasonable doubt as to count 17.[45]

In contrast, nothing in the content of the notes in Exhibit 22A relates to or supports the convictions for distribution of controlled substances charged in counts 1 through 16. The convincing and overwhelming nature of the proof of guilt against all three defendants on the count 1

---

**43.** The trial court need not make new findings regarding the first two prongs of *Enright.* The record supports the trial court's findings, under the preponderance of evidence test, that there was a conspiracy and that the convicted defendants were members of such conspiracy.

**44.** While the incriminations in Exhibit 22A related to a Medicaid investigation, these incriminations also directly effected the mail fraud counts charging that Blue Cross/Blue Shield was defrauded. Each mail fraud count charged one scheme, namely that the defendants "devised and intended to devise a scheme and artifice to defraud and to obtain money by means of false and fraudulent pretenses and representations from Medicaid ... and Blue Cross/Blue Shield of Michigan."

**45.** The government agrees with defendant Shannon Mahar that "conspiracy [under 21 U.S.C. § 846] charged in count one of the indictment is a lesser included offense of the charge of engaging in a continuing criminal enterprise [under 21 U.S.C. § 848] charged in count seventeen, and that the double jeopardy clause prohibits cumulative punishment for both offenses." On remand, the trial court's determination must reflect this correct concession of the government, should the trial court uphold the count 17 conviction.

Defendant Shannon Mahar's other double jeopardy claim, that his convictions under 21 U.S.C. § 841(a)(1) are lesser included offenses of 21 U.S.C. § 848, is precluded by *Garrett v. United States,* 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985).

conspiracy claim and the varying substantive counts, 2 through 16, has been set forth in part I. *supra*. We conclude that, as to those counts, the admission of Exhibit 22A was harmless beyond a reasonable doubt.

### VII.

In summary, the convictions of the three defendants are affirmed on the count 1 conspiracy charge. As to the respective convictions of each defendant on substantive counts 2 through 16, the convictions are affirmed, except as to the count 13 conviction of each defendant, which is vacated and set aside, and the count 14 conviction of defendants Riley Mahar and the Clinic, which convictions are vacated and set aside.

With respect to the count 17 conviction of defendant Shannon Mahar, and the mail fraud convictions of defendants Shannon Mahar and the Clinic, these are remanded to the trial court for further proceedings consistent with part VI. of this opinion.