892 F.2d 80
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES Of America, Plaintiff-Appellee,
v.
Julian LAWRENCE (88-2056); Carlena Lawrence (88-2086);
Eartha D. Gaines (88-2087); Michael Lawrence
(88-2109); and Bernard Peoples
(88-2135), Defendants-Appellants.
 Nos. 88-2056, 88-2086, 88-2087, 88-2109 and 88-2135.
 United States Court of Appeals, Sixth Circuit.
 Dec. 18, 1989.
 
 Before NATHANIEL R. JONES and MILBURN, Circuit Judges, and LIVELY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 In these consolidated appeals, four of the five defendants-appellants contest their jury convictions for the unauthorized use of access devices (credit card account numbers) and conspiracy to defraud in violation of 18 U.S.C. § 1029(a)(2) and (b)(2).[1]
 
 
 2
 Additionally, defendant-appellant Carlena Lawrence appeals the district court's sentencing determination that she was an "organizer or leader" of the conspiracy. For the reasons that follow, we affirm.
 
 I.
 
 3
 The defendants-appellants are: Carlena "Mickey" Lawrence, the sister of defendant Julian Lawrence and the mother of defendant-appellant Michael Lawrence and Monique Lawrence, a juvenile; Bernard Peoples, Michael Lawrence's friend and Monique Lawrence's boy friend; and Eartha Diane Gaines.
 
 
 4
 On March 30, 1988, the grand jury in the Eastern District of Michigan indicted seventeen people in connection with a scheme of credit card fraud that allegedly occurred between June 1987 and February 1988 in Saginaw, Michigan. On June 22, 1988, twelve defendants pleaded guilty, and the district court bifurcated the proceedings against the remaining five.
 
 
 5
 The jury trial of Julian and Michael Lawrence and Diane Gaines commenced on July 13, 1988, and continued until August 2, 1988. Julian Lawrence was found guilty of one count of conspiracy to commit fraud, in violation of 18 U.S.C. § 1029(b)(2), and sentenced to eighteen months imprisonment. Michael Lawrence was found guilty of one count of conspiracy, in violation of 18 U.S.C. § 1029(b)(2), and sentenced to thirty-three months imprisonment. Diane Gaines was convicted on one count of conspiracy, in violation of 18 U.S.C. § 1029(b)(2), and one count of unauthorized use of credit card account numbers, in violation of 18 U.S.C. § 1029(a)(2), and sentenced to terms of twenty-one months imprisonment on each count, with the terms to run concurrently.
 
 
 6
 The trial of Carlena Lawrence and Bernard Peoples commenced on August 9, 1988, and continued until August 22, 1988. Carlena Lawrence was found guilty of one count of conspiracy to commit fraud, in violation of 18 U.S.C. § 1029(b)(2), and one count of unauthorized use of credit card account numbers, in violation of 18 U.S.C. § 1029(a)(2). The district court found that she had not accepted responsibility for her criminal conduct and that she was the leader of the conspiracy. The district court sentenced her to thirty months imprisonment on each count, with the terms to run concurrently. Bernard Peoples was convicted of one count of conspiracy to commit fraud, in violation of 18 U.S.C. § 1029(b)(2), and sentenced to eight months imprisonment.
 
 
 7
 The evidence introduced at the trials establish that between July and December 1987, approximately $89,000.00 in merchandise was ordered from six different retail businesses and cable television shopping networks through the use of thirty-seven credit card account numbers and sent to fifteen addresses in Saginaw, Michigan. The merchandise was usually ordered in the names of the true credit card holders, but shipped to other people's addresses, and all of the orders were made without the consent of the credit card holders. Secret Service agents investigated the conspiracy by matching credit card account numbers with the records of the various retail businesses and United Parcel Service delivery logs, which showed the addresses where the packages were delivered and the signatures of the persons who accepted them. Among the residences that received significant amounts of merchandise ordered with fraudulently obtained credit card account numbers were: 1157 Cornelia, the residence of Carlena Lawrence; 421 Linton, Apt. 2, the residence of Bernard Peoples; and 2130 California, the residence of Eartha Diane Gaines.
 
 
 8
 Between November 30 and December 7, 1987, $994.00 worth of merchandise was ordered from the Cable Value Network with the credit card numbers of Luanne J. Maher and Randy Eischer. This merchandise was ordered to be shipped to 421 Linton, but was never actually shipped. The Network's records indicate that the Eischer order was designated to be shipped to Apt. # 2, Peoples' apartment, while the Maher order did not have an apartment designation.
 
 
 9
 On December 1, 1987, an order was placed with Maher's name and credit card account number with the J.C. Penney Company for drapes, sheets and a bedspread. The merchandise was ordered to be shipped to 421 Linton, Apt. # 2. On December 3, 1987, UPS delivered a package to that apartment and a "James Short" signed for it. A Michigan State Police handwriting expert testified that Peoples "probably" signed the name "James Short."
 
 
 10
 On December 8, 1987, three orders were placed with QVC Cable Shopping Network in the name and credit card account number of Winfred Geyer. The merchandise was to be shipped to 421 Linton, Apt. # 2. Only one of these orders, a jewelry box worth $26.51, was actually shipped to that address. It was delivered on December 16, 1987, and signed for by Darlyne McKinney, one of Peoples' neighbors. A few minutes after McKinney signed for the package, Peoples came over and picked it up.
 
 
 11
 Further evidence showed that Maher's and Eischer's names and credit card account numbers were used to order merchandise for delivery to several other addresses in Saginaw, including Carlena Lawrence's address. Similarly, Winfred Geyer's name and credit card account number were used to place orders to be shipped to 2130 California, defendant Diane Gaines' address.
 
 
 12
 Secret Service agents interviewed Carlena Lawrence in mid-December 1987. She told the agents that packages in other peoples' names began arriving at her residence in early November from various cable television shopping networks. She denied ordering the packages or knowing who had. She stated that among the merchandise that had arrived at her home were three watches which she had sold.
 
 
 13
 Immediately after interviewing Lawrence, the agents learned that the UPS was scheduled to deliver several packages to her residence, and those packages contained merchandise which had been ordered in the names of people whose credit card account numbers were being used fraudulently. On December 23, 1987, as Secret Service agents observed, a UPS driver delivered a package addressed to Luanne Maher at Lawrence's Cornelia Street address. Lawrence identified herself as Luanne Maher, signed the delivery log with the name "Luanne Maher," and accepted the package. Immediately thereafter, Secret Service agents knocked on Lawrence's door. She turned over the package to one of the agents and stated it was not hers.
 
 
 14
 The agents then executed a search warrant they had obtained earlier and searched Lawrence's residence. The agents found many items that had been ordered from various businesses and cable television shopping networks and stacks of catalogs. The agents also found several catalog order forms that had been partially completed in the handwriting of Carlena or her seventeen-year-old daughter, Monique. The forms had been completed to bill the orders to credit card account numbers that did not correspond to any of Monique's or Carlena's personal accounts.
 
 
 15
 On January 5, 1988, federal and local law enforcement officers traveled to Bernard Peoples' apartment to execute a search warrant. After they knocked on his door, they heard someone inside, but as no one answered the door, they knocked it down with a battering ram. The agents entered the apartment with their guns drawn, and found Peoples lying face down on his bathroom floor with a revolver near his left hand.
 
 
 16
 The agents holstered their weapons, frisked Peoples, and then Secret Service Agent James Lauman escorted him into the living room. Peoples sat on his sofa, and Agent Lauman sat across from him in a chair. The other agents and officers divided themselves into teams and began searching other areas of the apartment. Agent Lauman showed Peoples a copy of the search warrant and explained that he was not under arrest and was free to leave the apartment and the building, but he could not wander about the apartment while the agents were searching it.
 
 
 17
 Peoples remained in the living room, and Agent Lauman remained with him. Eventually, Agent Lauman questioned Peoples about Carlena Lawrence, and Peoples responded that he "hung around" her house and he knew people who were engaged in credit card fraud. He admitted that he had received a package from UPS that contained a bedspread and sheets. He first said that he sold the linens; later he said he gave them away.
 
 
 18
 Approximately twenty minutes after the search began, a uniformed officer and Peoples' mother entered the apartment, and Agent Lauman repeated that Peoples was free to leave. The uniformed officer had been securing the outside of the building and stepped in from the January evening to warm herself. She did not ask Peoples any questions. Approximately ten minutes later, another agent asked Peoples about a watch, which the agent believed was part of an order of watches that had been fraudulently shipped to Carlena Lawrence's residence. Peoples stated that he had purchased the watch, but he could not produce a receipt.
 
 
 19
 Other evidence included transcripts of telephone conversations between various defendants and Laverne Craion, an acquaintance of defendant Julian Lawrence. In December 1987, Craion approached the police and reported that Julian Lawrence had stolen a ring from her and when she protested, he offered to let her order a ring from one of several catalogs he provided to her. She also told police that Julian Lawrence gave her two names and credit card numbers, and told her she could pay for the ring by charging it to one of the numbers. Craion consented to allow Secret Service Agents to tap her telephone and record her conversations with the defendants.
 
 
 20
 In a telephone conversation recorded on December 21, 1987, Carlena Lawrence promised to give Craion a credit card account number so she could order a ring. In another telephone conversation recorded December 21, 1987, Julian Lawrence told Craion that he would have to "talk to Mickey" (Carlena Lawrence) about getting a new credit card account number because he could no longer place orders with the number he had been using. Craion suggested that Julian get a number from "Mickey's book," but Julian stated that Mickey kept her book "put up in her room" and would allow no one access to it. In telephone conversations recorded in early January 1988, Julian Lawrence repeatedly told Craion that "things were tight," and that Mickey's "book" was "burned up," but he would obtain a credit card account number for her in order that she could order a ring.
 
 
 21
 Among the witnesses who testified at trial were Catrene Lawrence, Carlena Lawrence's niece, and Charlotta Barney, Carlena's neighbor. They testified that they visited Carlena Lawrence's house frequently in the fall of 1987, and when they did, they often observed sheets of paper with lists of numbers and names in the house. They also testified that they observed Monique and Michael Lawrence and others ordering merchandise over the telephone, often under the direction of Carlena Lawrence. They also testified that they had each heard Michael Lawrence and others say in conversations that they were obtaining credit card account numbers from where they worked.
 
 
 22
 Defendant Diane Gaines testified that she was a "contest junkie" and that because of her fondness for entering contests and occasional luck at winning them, she received a great deal of mail everyday. She further testified that she believed that when something came to her house, it was hers automatically "unless you come and tell me otherwise, that it's not mine." She thought that the packages that came to her home during the time of the conspiracy were prizes she had won, and she never looked to determine their place of origin.
 
 
 23
 The principal issues raised in these consolidated appeals are: (1) whether the district court erred in finding that Carlena Lawrence was an organizer or leader of the conspiracy, (2) whether the district court erred in denying Bernard Peoples' motion to suppress, (3) whether the evidence presented at trial was sufficient to support Peoples' conviction, (4) whether the district court erred in allowing credit card holders to recite their account numbers from their billing statements and credit card receipts, and (5) whether the district court erred in denying Julian Lawrence's motion for acquittal.
 
 II.
 A.
 
 24
 In sentencing Carlena Lawrence, the district court calculated her offense level score to be thirteen, and then added four points after determining that she was an "organizer or leader" of a criminal enterprise that involved "five or more participants or was otherwise extensive." United States Sentencing Commission, Guidelines Manual ("Manual" ) § 3B1.1(a). By increasing her score, the district court made Lawrence eligible to receive a sentence of between twenty-four and thirty months. The district court then sentenced her to the maximum of thirty months on each count, with the two terms to run concurrently.
 
 
 25
 Lawrence asserts on appeal that the government did not produce any evidence that she ever carried the title or fulfilled the function of a "kingpin" or "boss" in the conspiracy. She admits that she was a participant in the credit card fraud, but claims that the district court penalized her because of her failure to prevent her adult-aged children from participating in the scheme.
 
 
 26
 In reviewing an appeal of an application of the sentencing guidelines, we "shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e). The evidence before the district court showed that Lawrence collected the credit card account numbers in a notebook and she controlled access to the notebook; she directed her juvenile daughter and others to place fraudulent orders for merchandise over the telephone; and she was recognized by other members of the conspiracy as controlling access and use of the credit card account numbers. This led the district court to find that
 
 
 27
 [Carlena Lawrence,] you're the person who had the opportunity to save all of your friends and relatives all of this grief, but you didn't.
 
 
 28
 From the total evidence, you [Carlena Lawrence] were the one, as I say, you were the leader of it all. You were taking advantage of it. You were thumbing your nose, you were acting totally greedy.
 
 
 29
 Carlena Lawrence J.A. 42. Despite Carlena Lawrence's protestations that she was being punished for the crimes of her adult-aged children, the district court also found that one of the conspiracy members who acted under her direction was her seventeen-year-old daughter, Monique.
 
 
 30
 Nothing in Lawrence's arguments persuades us that the district court's findings of fact are clearly erroneous. Mindful of the deference we must give to the district court's "application of the guidelines to the facts," 18 U.S.C. § 3742(e) (Supp.1989), we affirm its decision to enhance Carlena Lawrence's sentence for being an "organizer or leader" of the conspiracy. See Manual, Commentary § 3B1.1(a).
 
 B.
 
 31
 Defendant Bernard Peoples argues that the district court should have granted his motion to suppress statements he made during the search of his apartment because he was never informed of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). Peoples also argues that the district court erred in denying his motion to dismiss the indictment, which he insists was based upon statements the Secret Service agents obtained in an unlawful interrogation.
 
 
 32
 In a suppression hearing, the burden of proof or persuasion rests with the party seeking to suppress the evidence. United States v. Smith, 783 F.2d 648, 650 (6th Cir.1986). Where a party seeks suppression of his statements based upon a failure to receive his Miranda warnings, he must demonstrate by a preponderance of evidence, see Colorado v. Connelly, 479 U.S. 157, ---, 107 S.Ct. 515, 522-23 (1987), that he was entitled to receive them; i.e., that he was subjected to a "custodial interrogation." United States v. Charles, 738 F.2d 686, 692 (5th Cir.1984).
 
 
 33
 The key to Peoples' arguments is whether he was "in custody" at the time he was questioned. That inquiry raises the question of how a reasonable man in Peoples' position would have understood his situation at the time of the questioning. Berkemer v. McCarty, 468 U.S. 420, 442 & n. 35 (1984). The fact that a suspect was told that he was free to leave is a significant factor that weighs against his claim that the interrogation was custodial. See United States v. Knox, 839 F.2d 285, 292-93 (6th Cir.1988), cert. denied, 109 S.Ct. 1742 (1989).
 
 
 34
 Agent Lauman testified at the suppression hearing that had Peoples attempted to leave his apartment before the officers had gained entry, he would have been stopped and searched to prevent him from removing evidence. After that, however, Lauman said Peoples would have been free to go. Lauman testified that he showed Peoples a copy of the warrant and repeatedly told Peoples that he was free to leave. He also testified about the other agent's questions about the watch they found in the apartment and the presence of Peoples' mother during the latter stages of the search. Peoples testified that he did not believe that he could leave his apartment while the agents searched it, and he did not remember being told he was free to go.
 
 
 35
 The district court recognized that under the circumstances, the atmosphere in Peoples' apartment was tense. However, the district court found that the agents had informed Peoples that he was free to go, Peoples' J.A. 44, and that under the totality of the circumstances, Peoples had not shown that at the time Agent Lauman questioned him in his living room, a reasonable person would have felt his freedom of action had been curtailed to a "degree associated with formal arrest." We cannot say the district court's findings were clearly erroneous, and we agree that Peoples has failed to show by a preponderance of evidence that he was "deprived of his freedom of action in any significant way," Miranda, 384 U.S. at 444; see also Knox, 839 F.2d at 292-93, and, therefore, the district court did not err in denying Peoples' motion to suppress.
 
 
 36
 Peoples next argues that the district court erred in denying his motion for acquittal pursuant to Federal Rule of Criminal Procedure 29. Peoples offered his motion at the close of the government's evidence and the district court denied it. Peoples failed to renew his motion at the close of all evidence, and, therefore, our review is limited to whether denial of the motion amounted to "a manifest miscarriage of justice." United States v. Faymore, 736 F.2d 328, 334 (6th Cir.), cert. denied, 469 U.S. 868 (1984). Our review of the record reveals more than sufficient evidence to support the jury's verdict on each element of the offense charged against defendant Peoples.
 
 C.
 
 37
 At the trials, the government called twenty-nine credit card holders whose accounts had been charged without their approval, allegedly as a result of the defendants' fraudulent activities. Each card holder brought a monthly billing statement or receipt received during the existence of the alleged conspiracy. The government proffered these statements and receipts for the sole purpose of allowing the card holders to testify what his or her account numbers were during the period of the conspiracy.
 
 
 38
 Defendants Julian and Michael Lawrence and Diane Gaines objected at trial that the billing statements and receipts were inadmissible as hearsay. The government countered that the documents were admissible either for purposes of authentication, Fed.R.Evid. 901, or as "business records" excepted from the hearsay bar under Rule 803(6). In deciding the issue, the district court turned to the statutory definition of "access device," which includes "any card, plate, code, [or] account number ... that can be used ... to obtain money, goods, services, or anything of value....", 18 U.S.C. § 1029(e)(1), and ruled:
 
 
 39
 It's an access device, whether it was properly issued by the company or not. If he [the card holder] has a number and he can use that number to make purchases, that makes it an access device.
 
 
 40
 It means any card, plate, code or account number or other means of access that can be used alone or in conjunction with an access device to obtain money, goods, or services.
 
 
 41
 The real access device is what the individual has. The access device for my Master charge account is in my pocket, and my number is in my pocket. The number belongs to the individual.
 
 
 42
 I'm going to allow you to introduce the [card holder's monthly billing statement] for the limited purpose of showing what his credit card number was.
 
 
 43
 Secondly, if he needs to do it, he can use it to refresh his recollection as to what purchases he made or what purchases he didn't make.
 
 
 44
 You may want to show, for example, a particular person made a purchase at a particular restaurant or a particular place. That may be of significance, and that may refresh his recollection on that issue.
 
 
 45
 But I'm going to allow the document in, but it can't go to the jury unless you pare the document down to showing that it is his account number.
 
 
 46
 Gaines' J.A. 243-244 (emphasis added).
 
 
 47
 Generally, the decision to admit or exclude evidence is within the discretion of the district court, and we will not reverse that decision absent a showing that the district court clearly abused its discretion. United States v. Rios, 842 F.2d 968, 872 (6th Cir.1988) (per curiam), cert. denied, 109 S.Ct. 840 (1989). While the district court did not specifically explain the basis of its decision to admit the contested billing statements and receipts, the passage quoted above makes it clear that the district court relied upon Rule 612, which provides for the use of writings for the purpose of refreshing witnesses' recollections "for the purpose of testifying." We believe the district court did not abuse its discretion in admitting the monthly billing statements and receipts for this purpose, especially in light of the rule that the writings themselves need not be independently admissible before they may be used to refresh a witness' recollections. United States v. Faulkner, 538 F.2d 724, 727 (6th Cir.), cert. denied, 429 U.S. 1023 (1976); see also United States v. Kusek, 844 F.2d 942, 949 (2d Cir.), cert. denied, 109 S.Ct. 157 (1988).
 
 
 48
 The parties, however, have ignored Rule 612 and concentrated their arguments on the admissibility of the monthly billing statements and receipts pursuant to the "business records" exception to the hearsay bar. Fed.R.Evid. 803(6). For a record to qualify for admission pursuant to Rule 803(6):
 
 
 49
 (1) it must have been made in the course of a regularly conducted business activity; (2) it must have been kept in the regular course of that business; (3) the regular practice of that business must have been to have made the memorandum; and (4) the memorandum must have been made by a person with knowledge of the transaction or from information transmitted by a person with knowledge.
 
 
 50
 Redken Labs. v. Levin, 843 F.2d 226, 229 (6th Cir.), cert. denied, 109 S.Ct. 137 (1988). Before the records will be admitted, the proffering party must lay a foundation with the testimony of a custodian of the records or a "qualified witness," someone familiar with the business' record keeping system. United States v. Hathaway, 798 F.2d 902, 906 (6th Cir.1986).
 
 
 51
 In these consolidated appeals, the parties have not contended that the card holders' monthly bills and the receipts were not "business records" within the meaning of Rule 803(6).[2] However, defendants Michael Lawrence and Diane Gaines assert that the card holders were not "qualified" to lay the foundation for the admission of the business records. We find this argument to be without merit in light of the limited purpose for which the records were admitted and the defendants' concession that the bills and receipts were business records.
 
 
 52
 Defendants' arguments reveal a misunderstanding of Rule 803(6), for as we have made clear, a witness need not have been personally involved in making the records to be qualified to lay the foundation to introduce them into evidence. Hathaway, 798 F.2d at 906. Contrary to defendants' assertions, the witnesses' unfamiliarity with the total record-keeping systems of their banks and card-issuing companies did not necessarily render them incompetent to testify to the account numbers they had been assigned. In addition, defendants had no "right" to confront and cross-examine the records' custodians, though we note that they were able to confront and cross-examine the card holders.
 
 
 53
 Defendants' reliance upon United States v. Mahar, 801 F.2d 1477 (6th Cir.1986), is grossly misplaced. There, this court was faced with the question of whether twelve pages of undated, unsigned, handwritten notes qualified as "business records." We found they did not, as there was no proof they were kept in the ordinary course of a regularly conducted business activity. Id. at 1493. Clearly, that holding has no application to this case, where there is no issue as to whether the bills and receipts were business records.
 
 
 54
 We also find that defendants' challenge fails to consider the difference between the admissibility of the proffered evidence and the weight a jury may assign it. See United States v. Sachs, 801 F.2d 839, 843 (6th Cir.1986). The majority of defendants' arguments have focused on considerations that might persuade a jury to give the evidence little weight; but those same considerations do not automatically render the proffered evidence inadmissible.[3]
 
 
 55
 The government also called Joseph LaPalm, Karen Duffy, Carol Burns, and Jan Pederson, who worked in the credit departments of some of the businesses that received fraudulent orders, allegedly as a result of the defendants' conspiracy. These four testified that while their employers' computerized sales records were assembled by employees across the country, as credit personnel they had access to the records and training in how to interpret them. They also testified that the records showed that certain orders received during the period of the conspiracy were billed to the fraudulently obtained account numbers allegedly used by members of the conspiracy.
 
 
 56
 Defendant Julian Lawrence asserts that the sales records were not admissible as "business records" because the credit personnel were not "qualified witnesses." He raises this argument for the first time on appeal, and, therefore, the scope of our review is limited by the doctrine of plain error. Chandler v. Jones, 813 F.2d 773, 777 (6th Cir.1987).
 
 
 57
 We find that Julian Lawrence's attacks on the qualifications of the credit employees are devoid of merit and based upon a misguided, anachronistic interpretation of Rule 803(6). Computer-generated records may be admissible as business records where
 
 
 58
 (1) The records [are] kept pursuant to some routine procedure designed to assure their accuracy, (2) they must be created for motives that would tend to assure accuracy (preparation for litigation, for example, is not such a motive), and (3) they must not themselves be mere accumulations of hearsay or uninformed opinion.
 
 
 59
 United States v. Glasser, 773 F.2d 1553, 1559 (11th Cir.1985) (emphasis in original). While the witness who introduces the records need not be the person who assembled or created them, he should be familiar with, and able to describe, the procedures and methods used to assemble the records and ensure their reliability. See United States v. Hayes, 861 F.2d 1225, 1228 (10th Cir.1988) (IRS computerized tax records admissible when introduced by IRS tax examiner); Glasser, 773 F.2d at 1559; United States v. Scholle, 553 F.2d 1109, 1125 (8th Cir.), cert. denied, 434 U.S. 940 (1977). We hold that the government laid a proper foundation for the evidence, and the district court did not abuse its discretion in admitting it.
 
 D.
 
 60
 At the conclusion of all the evidence, Julian Lawrence moved for acquittal pursuant to Federal Rule of Criminal Procedure 29 on the basis that no witness had identified him as the Julian Lawrence charged with participating in the credit card fraud conspiracy. The district court denied the motion and allowed the government to reopen its case and call one witness to make an in-court identification. The defense counsel than moved that he be allowed to reopen his defense and call Julian Lawrence as a witness. The district court agreed to allow Julian to testify, but only on the issue of identification. The government then called Secret Service Agent Larry Porte, who made an in-court identification of Julian Lawrence, and was subjected to cross-examination. Thereafter, defense counsel declined to call Julian as a witness, and the district court closed the case.
 
 
 61
 Our review of the district court's denial of a motion to acquit is guided by the inquiry of whether, at the time the motion was made, the government had presented evidence from which the jury could reasonably find the defendant guilty beyond a reasonable doubt. United States v. Fawaz, 881 F.2d 259, 261 (6th Cir.1989). While the government bears the burden of proving every element of the offense charged, including the identity of the accused, the lack of in-court identification is not necessarily fatal to the prosecution of a case. See United States v. Doherty, 867 F.2d 47, 67 (1st Cir.), cert. denied, 109 S.Ct. 3243 (1989); United States v. Weed, 689 F.2d 752, 755-57 (7th Cir.1982); United States v. Darrell, 629 F.2d 1089, 1091 (5th Cir.1980); United States v. Fenster, 449 F.Supp. 435, 439-42 (E.D.Mich.1978).
 
 
 62
 In this case, the government presented the testimony of several witnesses personally familiar with Julian Lawrence, including his former girl friend and several friends and relatives. None of the witnesses protested that the man introduced to the court at the outset of the trial as Julian Lawrence was not the Julian Lawrence accused of credit card fraud. Additionally, Julian Lawrence's defense attorney conceded that the government would not perpetrate a fraud upon the court by trying the wrong man. J.A. 396.
 
 
 63
 This case is distinguishable from United States v. Metz, 312 F.2d 199 (6th Cir.), cert. denied, 375 U.S. 817 (1963), where the government continually referred to one of the perpetrators by a nickname, yet never established that either of the defendants was known by that name. Here the circumstantial evidence introduced at the time the motion was offered was sufficient to identify the Julian Lawrence at the defendants' table as "the person who [allegedly] committed the crime." Darrell, 629 F.2d at 1091. For these reasons, we find that the district court did not err in denying Julian Lawrence's motion for acquittal.[4]
 
 III.
 
 64
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 18 U.S.C. § 1029 provides in part:
 Fraud and related activity in connection with access devices
 (a) Whoever-
 * * *
 (2) knowingly and with intent to defraud traffics in or uses one or more unauthorized access devices during any one-year period, and by such conduct obtains anything of value aggregating $1,000 or more during that period;
 * * *
 shall, if the offense affects interstate or foreign commerce, be punished as provided in subsection (c) of this section.
 (b) ...
 (2) Whoever is a party to a conspiracy of two or more persons to commit an offense under subsection (a) of this section, if any of the parties engages in any conduct in furtherance of such offense, shall be fined an amount not greater than the amount provided as the maximum fine for such offense under subsection (c) of this section or imprisoned not longer than one-half the period provided as the maximum imprisonment for such offense under subsection (c) of this section, or both.
 * * *
 (e) As used in this section-
 (1) the term "access device" means any card, plate, code, account number, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument)....
 
 
 [2]
 We express no opinion whether the bills and receipts in question were business records within the meaning of Rule 803(6). Instead, given defendants' failure to object to the records as such, and the district court's multifaceted decision to admit the records, we accept the parties' characterization for the limited purpose of this appeal
 
 
 [3]
 Defendants also raise a number of arguments concerning Rule 803(24), the catchall exception to the hearsay rule. These are interesting arguments but have no applicability to this case, as the government did not seek to introduce the records pursuant to the catchall exception
 
 
 [4]
 Julian Lawrence's arguments completely ignore the district court's ruling to allow him to reopen his defense and testify on the controversy raised by his motion to acquit. Considering the circumstantial evidence before the jury at the time Lawrence moved to acquit, we believe the district court's deft handling of the motion eliminated the possibility of any unfairness arising from the government's failure to include an in-court identification in its case-in-chief