IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

June 25, 2020 Session

**STATE OF TENNESSEE v. JOSEPH MORAN**

**Appeal from the Criminal Court for Shelby County**
**No. 17-01852      W. Mark Ward, Judge**

_____

**No. W2019-00837-CCA-R3-CD**

_____

A Shelby County jury convicted the defendant, Joseph Moran, of two counts of sexual battery and one count of domestic assault by provocative contact. Following a sentencing hearing, the trial court imposed an effective sentence of two years, suspended to supervised probation after serving sixty days in confinement. On appeal, the defendant argues the trial court erred in denying his motion to suppress. Upon our review of the record, arguments of the parties, and pertinent authorities, we agree the trial court erred in denying the defendant's motion to suppress, but given the otherwise overwhelming evidence presented at trial, this error was harmless. Therefore, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J. and CAMILLE R. MCMULLEN, J., joined.

Jessica Wiseman (on appeal) and Arthur Quinn (at trial), Memphis, Tennessee, for the appellant, Joesph Moran.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Holly Palmer and Jeff Jones, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

On April 13, 2017, the defendant was indicted for rape (count 1), aggravated sexual battery (count 2), kidnapping (count 3), and domestic assault (count 4) stemming from

actions committed against the victim, the defendant's girlfriend. Prior to his arrest, the defendant gave a statement to responding officers regarding his involvement in the crimes. The defendant subsequently filed a motion to suppress this statement, and the trial court conducted a pre-trial hearing on April 20, 2018.

I.      *Motion to Suppress*

In his motion to suppress, the defendant argued he did not waive his *Miranda* rights prior to giving the statement to police, thus rendering it involuntary.[1] The State disagreed and presented the following evidence supporting its position at the suppression hearing.

Officer Sam Lin with the Memphis Police Department ("MPD") testified he and his partner, Officer D'Andre Johnson, responded to a criminal assault call at the defendant's residence on July 17, 2016. When they arrived at the defendant's apartment building, Officer Lin saw the victim sitting outside on the curb. The victim told the officers she had been raped and informed them that the defendant was inside the residence. Officer Lin knocked on the front door, and the defendant answered, identified himself, and told the officers that the victim was his girlfriend.

At that point, Officer Lin placed the defendant in handcuffs and escorted him to the back seat of his police car. Although no decision had been made as to whether the defendant should be placed under arrest, Officer Lin testified, once the defendant was handcuffed and placed in the police car, he was detained for further investigation. Officer Lin then asked the defendant "what happened," and the defendant "told [the officers] his side of the story." Though he could not recall the defendant's entire statement, Officer Lin specifically remembered the defendant stating that he was unable to maintain an erection and began rubbing his penis on the victim's vagina. Regarding Officer Lin's demeanor during their conversation, he testified that he spoke in the same volume and tone that he used during the hearing. Additionally, Officer Lin agreed the defendant remained calm and was not aggressive or defensive during their interaction.

Following the defendant's statement, Officer Lin went back and forth between the defendant and victim several times to see if their stories were similar and agreed their stories matched. Although he probably asked the defendant additional questions during this time, at the hearing, Officer Lin could not recall what those questions were. At some point, the defendant asked to speak with the victim, and Officer Lin brought the victim over to the police car. However, while he remained close by, Officer Lin did not listen to their conversation. Additionally, Officer Lin testified the door to the police car remained

---

[1] *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

open throughout his conversation with defendant, but it was closed when the defendant was speaking with the victim.

Following his initial investigation, Officer Lin requested backup, and Lieutenant Charles Mowery arrived and made the decision to place the defendant under arrest. Officer Lin acknowledged, because he was a new officer at the time and had just completed training, he did not include any information regarding the defendant's statement in his report. On cross-examination, Officer Lin agreed the defendant was not free to leave once he was handcuffed, and he did not *Mirandize* the defendant prior to speaking with him.

Officer D'Andre Johnson with the MPD testified he was patrolling with Officer Lin on the day in question. However, because Officer Lin was the investigative officer on the case, Officer Johnson could only recall "bits and pieces" of what happened. After speaking with the victim outside of the residence, Officers Johnson and Lin knocked on the front door, and the defendant came outside. Officer Johnson recalled the defendant being placed in the back of the police car but could not remember whether the defendant was handcuffed at that time. Officer Johnson then sat in the front seat of the police car while Officer Lin went back and forth between the defendant and victim.

Officer Johnson was listening to the defendant's conversation with Officer Lin and recalled hearing the defendant make the following statement:

> The defendant advised that his girlfriend came home from a trip. They took a shower together. Once they got out of the shower he wanted to have sex with her so he asked her not to put her clothes on. But before they initiated the sex, he – she advised him that she actually had sex with someone else while she was out of town. I guess he became upset at that point and he pulled her outside in an attempt to embarrass her. And eventually they went back in the house and tried to have sex with her again at that point but he couldn't get an erection. So eventually I think her brother or brother-in-law came and they called the police afterwards.

Officer Johnson testified the defendant was calm and forthcoming during his conversation with Officer Lin and acted "as if he did [not do] anything wrong." Officer Johnson agreed it is important to include any statements made on the scene in the police report and acknowledged he did not review Officer Lin's report prior to it being filed.

On cross-examination, Officer Johnson testified the defendant was detained when he was placed in the police car and was not free to leave. He also agreed the defendant was not *Mirandized* prior to speaking with Officer Lin.

After its review, the trial court issued an order denying the defendant's motion to suppress the statement finding the defendant did not carry his burden of proving the defendant was in custody at the time the statement was made. The defendant then proceeded to trial.

## II.     Trial

The evidence produced at trial showed on July 17, 2016, the victim returned home to the apartment she shared with the defendant, her boyfriend at the time, and Travis Emmons, their roommate, following a week-long cruise. After a brief discussion about her trip, the victim and defendant went upstairs and showered together. The defendant then intimated that he wanted to have sex. However, the victim put on a t-shirt and underwear and told the defendant that she had cheated on him during her cruise. The defendant calmly told her that she "should probably go stay with [her] mom for a few days" and went downstairs.

The victim called her mother to let her know that the victim would need to stay with her for a few days. Suddenly, the defendant reentered the bedroom and began screaming at the victim that she needed to "get the f*** out." The victim's mother heard "some scuffling and some thuds and then [the victim] screamed and the phone went dead." The defendant then pushed the victim onto the bed and removed her clothing. He grabbed her by the wrists, pulled her downstairs, and took her outside onto their back patio. Although the victim did not see any neighbors outside, the defendant loudly asked if anyone else "want[ed] to come f*** [his] w**** girlfriend." The victim attempted to pull away from the defendant but was unable to escape his grasp.

After several minutes, the defendant pulled the victim back inside the apartment and into their bedroom. He then pushed the victim onto the bed and got on top of her. The victim was crying and tried to cover her face with her hands, but the defendant pulled her hands away and told the victim to look at him. He then digitally penetrated the victim's vagina and attempted to penetrate her with his penis. However, because he was unable to maintain an erection, the defendant could not fully penetrate the victim and instead rubbed his penis on her vagina.

Meanwhile, the victim's mother, who had tried to call the victim back several times, was "very afraid" for the victim's safety and called her son-in-law, Zach Seals, who was at her other daughter's home. Because Mr. Seals was closer to the victim's apartment, the victim's mother asked him to check on the victim.

Mr. Seals drove to the victim's apartment and rang the doorbell, which effectively stopped the assault. The defendant quickly put on some clothes and went downstairs to

answer the door. The victim heard Mr. Seals' voice, got dressed, and went downstairs. She grabbed her suitcase, which was still packed from the cruise, and began filling it with additional clothing. After leaving the apartment, Mr. Seals walked the victim to his car and asked her what happened. The victim told Mr. Seals that she had been beaten and raped, and Mr. Seals called 911.

Officer Lin received a call from dispatch advising him of a criminal assault complaint at the defendant's apartment. Upon arriving at the scene, Officer Lin observed the victim sitting on the curb outside of the apartment building. She was "crying, emotional[,] and upset." The victim told Officer Lin that the defendant had taken her clothes off, forced her outside, digitally penetrated her, and rubbed his penis on her vagina after she confessed to cheating on him while on vacation. Officer Lin knocked on the defendant's door, and, after the defendant identified himself, Officer Lin placed him in handcuffs and escorted him to the back of the police car. Although the defendant was not yet under arrest, Officer Lin considered him a suspect and "detained [him] for further investigation."

Because this was a domestic disturbance, Officer Lin wanted to talk to both parties to determine what had happened and asked the defendant to explain his side of the story. Although, at trial, Officer Lin could not recall the defendant's exact statement, he did recall the defendant stating that he was unable to get an erection so he rubbed his penis on the victim's vagina. Despite the importance of including the defendant's statement in the police report, Officer Lin failed to include any mention of the statement in his report.

At some point, the defendant asked Officer Lin if he could speak to the victim, and Officer Lin approached the victim and asked if she wanted to talk to the defendant. While the victim stood next to the police car, the defendant asked her to "let him go back inside" so they could "talk things over," but the victim told the defendant that was not possible.

Upon arriving at the scene, Lieutenant Mowery made the decision to arrest the defendant, who was placed in another police car and transported to Felony Response. Meanwhile, Officer Lin transported the victim to the Rape Crisis Center for an examination. Prior to leaving for the Rape Crisis Center, the victim spoke with Lieutenant Mowery, who told her the defendant could be sent to prison for fifteen years if convicted. When the victim arrived at the Rape Crisis Center, she gave her statement to a detective and was then taken to an exam room where she spoke to a woman who again told her that the defendant could get "in a lot of trouble" for what he did. Because the victim loved the defendant and did not want him to go to prison for a long time, she decided not to go through with the exam at that time.

However, the next morning, the victim returned to the Rape Crisis Center and consented to a medical examination. The victim had not bathed or showered since the day before and was wearing the same clothing she had put on after the assault but did not have the underwear the defendant had pulled off of her during the assault. Nina Sublette, an expert forensic sexual assault examiner, performed the victim's exam. Ms. Sublette reported the victim had a normal pelvic exam without any visible trauma. However, during the victim's physical exam, Ms. Sublette noticed bruises on the victim's left arm and torso, which the victim testified she had not noticed prior to the exam. Ms. Sublette testified the bruises were consistent with the victim's account of the assault. Ms. Sublette also collected: "[the victim's] underwear, four buccal swabs for DNA comparison using her salvia, four vulva swabs, . . . and four vaginal swabs." Although the victim was not wearing the same underwear that she had worn at the time of the assault, Ms. Sublette testified she always collects a victim's underwear if they have not bathed since the assault because there could be evidence "on the outside of [their] genitals or inside [their] vagina" which could later transfer to the victim's underwear.

Agent Kendall Stoner, a forensic biology expert with the Tennessee Bureau of Investigation ("TBI"), analyzed the victim's rape kit, which included buccal, vaginal, and vulva swabs, and one pair of underwear. Her examination revealed the presence of spermatozoa on the victim's underwear. Agent Stoner explained the DNA profile found in the spermatozoa matched the DNA sample taken from the defendant. Examinations of the vaginal and vulva swabs did not reveal the presence of semen. Agent Stoner also analyzed two hand swabs taken from the defendant. The left-hand swab contained a DNA profile which was consistent with a mixture of two individuals. Although the major contributor profile was consistent with the defendant, the minor contributor's profile was limited and, therefore, Agent Stoner was unable to include or exclude any individuals. The right-hand swab contained a mixture of the defendant and victim's DNA.

At trial, the State called the victim's mother, Officer Sam Lin, Lieutenant Charles Mowery, Zachary Seals, Nina Sublette, Agent Kendall Stoner, and the victim as witnesses, and all rendered testimony consistent with the foregoing. On cross-examination, the victim agreed she worked as a waitress at a bar at the time of the assault. She also agreed she was unaware of the specific incident that caused her bruises and acknowledged it was probable that she had gotten bruised at work in the past. However, she had not worked the week leading up to the assault because she was on a cruise. Additionally, the victim testified she did not notice any bruises following the sexual activity during the cruise. The victim also agreed that she and the defendant had developed a safe word early in their relationship. She explained that she was experiencing a medical condition at the time which would sometimes make sexual intercourse painful. Although she would often continue through the pain, the victim did use the safe word a few times to get the defendant to stop sexual intercourse. However, the victim only used the safe word during the first few months of

their relationship, and, after the victim's medical condition went away, the victim did not use the safe word again. Regarding Mr. Emmons, her roommate, the victim testified she texted him after the defendant's arrest and asked him to take care of the defendant's dog.

The defendant called Mr. Emmons who testified he was roommates with the defendant and victim at the time of the assault. Because he was working at night, Mr. Emmons was asleep during the assault and its aftermath. However, he was later awakened by the victim knocking on his door. She told Mr. Emmons the police were there, and she put the defendant's dog in Mr. Emmons' room.

At the conclusion of proof, the State made the following election of offenses:

> With regard to Count 1 the State has elected to submit for your consideration the alleged act of the [d]efendant digitally penetrating the victim's vagina.

> With regard to Count 2 the State has elected to submit for your consideration the alleged act of the [d]efendant rubbing his penis on the victim's vagina.

Following deliberations, the jury found the defendant guilty of the lesser-included offenses of sexual battery (counts 1 and 2) and domestic assault by provocative contact (count 4). The defendant was acquitted on count 3. The trial court subsequently sentenced the defendant to an effective sentence of two years, suspended to supervised probation after serving sixty days in confinement. The defendant filed a motion for new trial which the trial court denied. This timely appeal followed.

## *Analysis*

The defendant's sole issue on appeal is the trial court's denial of his motion to suppress. Specifically, the defendant contends that the trial court applied the incorrect burden of proof regarding custody and that the State did not meet its burden of proving the voluntariness of the defendant's confession. The State contends the trial court correctly ruled the defendant was not in custody during his questioning.

Suppression issues on appeal are subject to a well-established standard of review. Appellate courts are bound by a trial court's findings of facts determined after a suppression hearing unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Matthew T. McGee*, No. E2011-01756-CCA-R3-CD, 2012 WL 4017776, at *2 (Tenn. Crim. App. Sept. 13, 2012). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the

evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. Appellate courts should consider the entire record, affording the prevailing party "the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence." *McGee*, 2012 WL 4017776, at *2 (citing *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001)); *see also State v. Sanders*, 452 S.W.3d 300, 306 (Tenn. 2014). However, applying the law to the factual findings of the trial court is a question of law, which is reviewed *de novo* on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

The Fifth Amendment to the United States Constitution, applicable to states through the Fourteenth Amendment, states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. Similarly, the Tennessee Constitution states "that in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. If a suspect is in police custody "or otherwise [has been] deprived of his freedom of action in any significant way," the police must first inform him of his Fifth Amendment rights for any subsequent confession to later be admissible as substantive evidence. *Miranda*, 384 U.S. at 444. In this regard, the United States Supreme Court has said, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* These rights may be voluntarily, knowingly, and intelligently waived. *Id.*

The *Miranda* decision only applies "to the questioning of an individual who has been taken into custody or otherwise deprived of his freedom by the authorities in a significant way." *State v. Dailey*, 273 S.W. 3d 94, 102 (Tenn. 2009) (quoting *Miranda*, 384 U.S. at 478) (internal quotation marks omitted). Accordingly, *Miranda* warnings are only required when a suspect is (1) in custody and (2) subjected to questioning or its functional equivalent. *State v. Walton*, 41 S.W. 3d 75, 83 (Tenn. 2001). In the absence of either, *Miranda* requirements are not necessitated. *Id.*

The test for determining if an individual is in custody for *Miranda* purposes is "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." *State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996). This is a fact-specific inquiry, and our Supreme Court has provided the following non-exhaustive list of relevant factors:

> [T]he time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint

imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt, and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

*Id.*

## A.    Burden of Proof

Initially, we must address the defendant's contention that the trial court applied the incorrect burden of proof in denying the motion to suppress. The defendant argues the trial court incorrectly held that the defendant bears the burden of establishing custody for the purposes of *Miranda*. Although the State acknowledged the trial court's ruling on this issue in its brief, the State contends it is not necessary for this Court to determine whether the trial court correctly placed the burden on the defendant.

The question of who has the burden of establishing custody for the purposes of *Miranda* appears to be one of first impression in Tennessee. The majority of other jurisdictions that have addressed this issue have held a defendant bears the initial burden of proving custody. In *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007), the Texas Court of Criminal Appeals held

[t]he mere filing of a motion to suppress does not thrust a burden on the State to show compliance with *Miranda* . . . warnings *unless and until* the defendant proves that the statements he wishes to exclude were the product of custodial interrogation. Thus, the State has no burden at all unless '*the record as a whole clearly establishe[s]*' that the defendant's statement was the product of custodial interrogation by an agent for law enforcement. It is the defendant's initial burden to establish those facts on the record.

(quoting Wilkerson v. State, 173 S.W.3d 521, 532 (Tex. Crim. App. 2005)) (emphasis in original). *See also United States v. Julian Lawrence*, 892 F.2d 80, 1989 WL 153161, at *5 (6th Cir. Dec. 18, 1989); *United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989); *United States v. Davis*, 792 F.2d 1299, 1309 (5th Cir. 1986); *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984); *United States v. Crocker*, 510 F.2d 1129, 1135 (10th Cir. 1975); *Finch v. State*, 518 So.2d 864, 871 (Ala. Crim. App. 1987); *State v. Castillo*, 186 A.3d 672, 682 (Conn. 2018); *State v. Rippe*, 193 P.3d 1215, 1222 (Haw. Ct. App. 2008); *State v. Godwin*, 436 P.3d 1252, 1264 (Idaho 2019); *Moody v. State*, 59 A.3d 1047, (Md.

Ct. Spec. App. 2013); *Commonwealth v. Medina*, 149 N.E.3d 747, 752 (Mass. 2020); *State v. Antwine Gomez*, No. L-17-1130, 2019 WL 647552, at *7 (Ohio Ct. App. Feb. 15, 2019); *Gardner v. State*, 306 S.W.3d 274, 294 (Tex. Crim. App. 2009); *State v. Kolts*, 205 A.3d 504, 358 (Vt. 2018). We see no reason to depart from the majority view on this issue. Therefore, we conclude the defendant bears the initial burden of proving custody for the purposes of *Miranda* before the burden shifts to the State to prove the voluntariness of the statement.

## B.     Custodial Interrogation

It is undisputed that Officer Lin's question to the defendant was likely to invoke an incriminating response, and therefore, the question of whether the defendant should have been given *Miranda* warnings prior to his interrogation will turn on whether the defendant was "in custody" at the time he was questioned.

At the conclusion of the suppression motion, the trial court held the defendant was not in custody at the time he made his statement to Officer Lin. The trial court noted the uniqueness of the facts in this case, specifically that the officers were responding to a domestic assault which required "both general on-the-scene questioning and a *Terry* investigative detention" to determine the primary aggressor.[2] The trial court theorized that requiring officers to *Mirandize* the parties in a domestic violence situation prior to conducting on-the-scene questioning would "likely defeat the law enforcement purposes and lead to many wrongful arrests." Additionally, because "responding to a domestic violence call is one of the most dangerous and volatile situations for police officers," officers responding to these calls might be required to separate the parties, question them in a place where they do not have access to weapons, and, in some circumstances, handcuff one or more parties for the safety of the officers.

Applying the *Anderson* factors, the trial court noted the defendant's questioning occurred while he was sitting in the back of a police car, which was parked in front of the defendant's apartment, and the defendant was not transported from the scene during questioning. Additionally, there were two officers present during the questioning, which lasted "a few minutes," and the only specific question Officer Lin could remember asking the defendant was "what happened?" The trial court noted the phrasing of Officer Lin's question "seem[ed] to indicate that the officer [was] in the fact-gathering process of the investigation." Furthermore, the trial court noted Officer Lin's demeanor during the questioning was "the same as his demeanor in court," and the defendant was "calm, non-aggressive and non-defensive." The trial court acknowledged the defendant was handcuffed and placed in the back of a police car prior to making his statement, and,

---

[2] *Terry v. Ohio*, 88 S.Ct. 1868 (1968).

- 10 -

although neither officer testified the handcuffs were used as a security precaution, the trial court opined it was "reasonable [to] assum[e]" the handcuffs were "due to safety concerns" based on the type of crime they were investigating. The trial court also noted the record was devoid of any evidence as to what other questions the officers asked the defendant, the extent to which the defendant was confronted with the officers' suspicions of guilt, or the extent to which the defendant was made aware he was free to not answer the officers' questions. Ultimately, the trial court held the defendant failed to carry his burden that "by the totality of the circumstances a reasonable person in the [d]efendant's shoes would have understood his situation as an arrest as opposed to a brief period of detention."

After carefully reviewing the proof at the motion hearing and trial, we conclude the trial court erred in finding the defendant was not in custody at the time of his statement. Upon arriving at the scene, Officer Lin observed the victim outside of the apartment building, and the victim told Officer Lin that she had been raped by the defendant, her boyfriend. Officer Lin knocked on the defendant's residence and asked him to identify himself and his relationship to the victim. Officer Lin then immediately handcuffed the defendant and placed him in the back of the police car, which was parked in front of the defendant's apartment. Once the defendant was detained, Officer Lin asked him, "What happened?" In response, the defendant admitted, in part, that, because he was unable to maintain an erection, he rubbed his penis on the victim's vagina. During the questioning, Officer Lin never told the defendant that he was not under arrest or that he did not have to answer any questions. Viewing this matter in the totality of the circumstances, we conclude a reasonable person in the defendant's position would have considered himself or herself deprived of freedom of movement to a degree associated with formal arrest. *See Walton*, 41 S.W.3d at 83 (finding custody when defendant was questioned while handcuffed in the back of a police car); *People v. McCabe*, 182 A.D.3d 772, (N.Y. App. Div. 2020) (finding custody when officers handcuffed the defendant, placed him in the back of a police car, and asked, "What happened?").

Although the State argues, and the trial court concluded, the purpose of Officer Lin's questioning was to clarify the nature of a potentially volatile situation, we disagree. It is true that "on-the-scene" questioning, where officers are simply trying to understand a confusing situation, does not require a *Miranda* warning. *Miranda*, 384 U.S. at 477-78. However, at the time of Officer Lin's questioning, the incident was completed, the parties were identified and separated, and the defendant was cooperative and responsive. "[W]here criminal events have been concluded and the situation no longer requires clarification of the crime or its suspects, custodial questioning will constitute interrogation." *People v. Rifkin*, 289 A.D.2d 262, 263 (N.Y. App. Div. 2001).

This is not to say that under different facts and circumstances the actions taken by the officers in this case would not be appropriate. We acknowledge "[a]n officer may ask

questions that are necessary to ensure the officer's safety or that of the public without violating the *Miranda* rights of a person in custody." *State v. Dyron Norm Yokley*, E2009-02646-CCA-R3-CD, 2011 WL 2120096, at *23 (Tenn. Crim. App. May 20, 2011) (citing *New York v. Quarles*, 467 U.S. 649, 657 (1984)), *perm. app. denied* (Tenn. Sept. 21, 2011). Additionally, courts have repeatedly held that an officer may handcuff a suspect or place him in a police car for safety purposes. *See United States v. Wright*, 220 Fed. Appx. 417, 420 (6th Cir. 2007) (noting that merely placing a suspect in the back of a police car does not constitute custody for the purposes of *Miranda*); *Robertson v. State*, No. W2011-00679-CCA-R3-PC, 2012 WL 5193364 at *11 (Tenn. Crim. App. Oct. 18, 2012) (citing numerous cases which state that handcuffing a suspect during a Terry stop is permissible for safety concerns), *no perm. app. filed*. However, in the present case, Officer Lin never articulated to the defendant that he was being handcuffed or placed in the back of the police car for safety reasons, and his testimony at the suppression hearing did not indicate the handcuffs or the police car were used due to concerns for the officers' safety.

We must now evaluate the effect of this error on the defendant's convictions. "The erroneous admission of evidence obtained in violation of a defendant's *Miranda* rights is a non-structural constitutional error, and as such, is subject to . . . harmless error analysis." *State v. Climer*, 400 S.W.3d 537, 569-70 (Tenn. 2013). The question is "'whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id.* At 569 (quoting *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008)). The State carries the burden of demonstrating the error was harmless. *Rodriguez*, 254 S.W.3d at 371.

Considering the evidence presented at trial as a whole, the trial court's error was harmless, as it did not "more probably than not [affect] the judgment or . . . result in prejudice to the judicial process." Tenn. R. App. P. 36(b). Even in the absence of the defendant's statement that he rubbed his penis on the victim's vagina, the State introduced ample evidence of the defendant's guilt at trial. The victim testified she confessed to the defendant that she had cheated on him during a recent vacation. The defendant then stripped the victim, forced her outside in an effort to embarrass her, held her down on the bed, and digitally penetrated her. The defendant also attempted penile penetration, but, because he was unable to maintain an erection, he rubbed his penis on the victim's vagina. The victim's mother testified she was speaking with the victim on the phone prior to the assault and heard the victim scream as the line went dead. The victim's mother asked Mr. Seals, the victim's brother-in-law, to check on her. Mr. Seals arrived at the defendant's apartment, and the victim told him that the defendant had raped and beaten her. Officer Lin responded to the victim's 911 call and spoke to the victim, who was sitting outside the apartment. Officer Lin described the victim's demeanor as "crying, emotional and upset" as she told him that she had been raped by the defendant. Ms. Sublette performed the victim's physical examination, and she observed several bruises on the victim's arm and

torso, which Ms. Sublette testified were consistent with the victim's story. Agent Stoner analyzed the evidence collected in this case and testified the victim's underwear contained spermatozoa matching the defendant's DNA. Additionally, the right-hand swab from the defendant contained a mixture of DNA matching both the defendant and the victim. The overwhelming evidence outlined above proves beyond a reasonable doubt that the error did not contribute to the verdict. Thus, the defendant is not entitled to relief on this issue.

## *Conclusion*

Based on the foregoing authorities and reasoning, the judgments of the trial court are affirmed.

_____
J. ROSS DYER, JUDGE